**COALITION OF MONTANANS CONCERNED WITH DISABILITIES, INC.,** a Montana non-profit corporation, the Bozeman Chapter of the Coalition, Plaintiff,

v.

**GALLATIN AIRPORT AUTHORITY,** John Doe I, John Doe II, and John Doe III, Defendants.

### No. CV 94–84–BU–DWM.

United States District Court,
D. Montana,
Butte Division.

March 27, 1997.

Monte D. Beck, John J. Richardson, Beck Law Office, Bozeman, MT, for Coalition of Montanans Concerned With Disabilities, Inc.

Edmund P. Sedivy, Jr., Morrow, Sedivy & Bennett, P.C., Bozeman, MT, for Gallatin Airport Authority.

## OPINION AND ORDER

MOLLOY, District Judge.

This case involves a dispute over whether the expansion of the Gallatin Field Airport Terminal complies with the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA").[1] The case raises a number of difficult issues involving statutory and regulatory interpretation as well as policy. The plaintiffs sue to enforce the requirements of the ADA, arguing there is a literal failure to comply with the Act and its enforcing regulations. The Congress assigned to the Attorney General the duty and power to interpret the statute and to set standards for enforcement and compliance. In this role, the Attorney General has been found wanting.

> Unfortunately, while the Department of Justice has issued broad Standards for Accessible Design, it has not seen fit to step up to its statutorily mandated role by providing concrete guidance for architects and builders.

*Paralyzed Veterans of America v. Ellerbe Becket Architects & Engineers.* 950 F.Supp. 393, 394 (D.D.C.1996).

Thus, I am asked to enforce demanding, confusing and controversial design requirements that the Department of Justice itself has never championed in any court or in any rule making procedure, even when invited to do so. *Id.* The task is particularly difficult

---

1. Similar issues were recently considered in *Paralyzed Veterans of America v. Ellerbe Becket Architects & Engineers,* 950 F.Supp. 393 (D.D.C. 1996). I find *Paralyzed Veterans* salient not only to the issues in this case, but also to its disposition.

here because both parties have acted in good faith. The arguments made by both sides make sense. That conclusion contributes credence to the controversy. The questions raised in this case are the kind of issues that are better resolved by politicians in the executive and legislative branches. Yet executive and legislative input create a statutory and regulatory scheme that is confusing at best. Despite my view, Congress formulated the public policy, and, it created a remedy by permitting the injured plaintiffs to sue to enforce the requirements of the Act, 42 U.S.C. § 12101 et seq.

Both sides have moved for summary judgment. The terminal facility at Bozeman does not comply with the requirements of the Americans with Disabilities Act. Thus, Plaintiffs are entitled to have the Authority enjoined to bring the terminal into compliance with the Act. I arrive at this conclusion for the reasons set forth below.

## I. BACKGROUND

In 1994, the Gallatin Airport Authority ("the Authority") began a three-phase, 8.7 million-dollar expansion of the Gallatin Field terminal. The project involved both remodelling the existing portions of the terminal and constructing additions onto the terminal. When the project is completed, approximately two-thirds of the ground floor, and 55–60% of the second floor and mezzanine will consist of new construction.

As part of Phase I of the expansion, the Authority moved the restaurant and bar from the ground floor to the mezzanine level, which is about three feet above the second floor. This move presented the problem of how to provide handicapped access to the new facilities. The existing elevator only went to the second floor, thus necessitating a stair climb to reach the mezzanine. To solve this problem, the Authority proposed installing a platform lift which would raise wheelchairs the additional three feet to the mezzanine.

The Coalition of Montanans Concerned with Disabilities ("the Coalition") have never been happy with this solution. They believe the use of platform lifts discriminates against the disabled by forcing them to use different facilities than the general public. The lift sometimes malfunctions, stranding people on the lift and forcing them to call for help. Members of the Coalition find this embarrassing and demeaning.

While the expansion was in the planning phase, the Coalition met with representatives of the Authority and expressed their concerns. The Authority refused to abandon its plans to use a platform lift. It did agree to screen the lift and to recess its floor mount. Despite the objections, Phase I went ahead as planned. The new restaurant opened on November 24, 1994.

The Coalition filed this suit in December 1994. The complaint alleges that the use of a platform lift under these circumstances violates the ADA. The Coalition seeks both a declaratory judgment stating that the Authority has violated the ADA, and an injunction ordering the Authority to modify the terminal to bring it into compliance. The Court is authorized to issue such an injunction by 42 U.S.C. § 12188(a)(1) and 36 C.F.R. § 36.501(b).

## II. DISCUSSION

### A. Overview

■ The overall policy of the ADA is to require relatively few changes to existing buildings, but to impose extensive design requirements when buildings are modified or replaced. *See* comments to 28 C.F.R. Subpart D. The Justice Department explains this policy as follows: "[T]he ADA is geared to the future—its goal being that, over time, access will be the rule rather than the exception." *Id.*

The regulatory scheme surrounding the ADA has at least four levels. First, there is the ADA itself. Title II of the ADA governs public entities, while Title III applies to providers of public accommodations. The Authority admits it is bound by both titles. Second, there are the regulations which the Justice Department has enacted under both Title II and Title III. These regulations supposedly flesh out the broad language of the ADA with more specific standards. Third, both sets of regulations adopt the ADA Ac-

cessibility Guidelines ("ADAGG") as binding standards for new construction and modifications to existing buildings.[2] Fourth, the Justice Department has issued various secondary materials explaining the ADA and associated regulations. These documents are persuasive authority. *See Paralyzed Veterans of America v. Ellerbe Becket Architects and Engineers*, 950 F.Supp. 389, 391–92 (D.D.C.1996).

Ordinarily, when faced with interpreting a complex system of regulations, it is helpful to have the benefit of a prior agency review of the merits of the case. Under the ADA, however, plaintiffs need not exhaust their administrative remedies before bringing suit. *See* 42 U.S.C. §§ 12133 and 12188; 28 C.F.R. § 35.172(b); 28 C.F.R. § 36.501. As a consequence, it is necessary to sort through the intricacies of the ADA regulations for the first time here.

## B. Analysis

The issue in this case is whether the ADAGG require the Gallatin Authority to install an elevator as part of the airport terminal expansion project. The ADAGG recognize three types of construction: "new construction," "additions," and "alterations." An "addition" is "[a]n expansion, extension, or increase in the gross floor area of a building or facility." ADAGG § 3.4. An "alteration" is "a change to a building ... that affects or could affect the usability of the building." *Id.* The ADAGG do not define "new construction." Presumably, the definition is obvious.

■ The Coalition suggested at oral argument that the airport expansion is so extensive that it should be considered new construction rather than an addition. This argument is not persuasive. The stipulated facts state that the added portions will comprise about one-half to two-thirds of the finished building. This ratio is not so dispro-

portionate as to violate the definition of "addition."

Assuming the project is an addition, the parties disagree over what rules apply to additions. This dispute stems from the following language of ADAGG:

### 4.1.5 Accessible Buildings: Additions.

Each addition to an existing building or facility shall be regarded as an alteration. Each space or element added to the existing building or facility shall comply with the applicable provisions of 4.1.1 to 4.1.3 Minimum Requirements (for New Construction) and the applicable technical specifications of 4.2 through 4.35 and sections 5 through 10.

The section contains two seemingly contradictory statements: (1) Additions are to be treated the same as alterations; and (2) Additions must meet the same standards as new construction. The apparent contradiction exists because the rules for alterations are quite different from the rules for new construction. In alterations, platform lifts may always be used instead of elevators. ADAGG § 4.1.6(3)(g). In new construction, platform lifts are almost never acceptable. ADAGG 4.1.3(5).

Each party reconciles the conflict in a way that serves its case. The Authority suggests that additions must meet the standards for new construction, except where those standards conflict with the more lenient rules for alterations. One of these more lenient rules is that lifts may be used instead of elevators. ADAGG § 4.1.6(3)(g). The Coalition argues the converse: that additions are subject to the rules for alterations, except that additions must meet the standards for new construction. ADAGG § 4.1.5. One of these standards is that an elevator must serve all levels. ADAGG § 4.1.3(5).

It is possible to reconcile these views. It is true that additions must meet the standards for new construction. But so must alterations. ADAGG § 4.6(b). Therefore, it

---

**2.** 28 C.F.R. § 36.406(a). Actually, the Title II regulations are more lenient. They allow public entities to choose between ADAGG and the Uniform Federal Accessibility Standards ("UFAS"). 28 C.F.R. § 35.151(c). Here, the Authority has chosen to follow ADAGG.

The Title II regulations allow departure from ADAGG and UFAS when "it is clearly evident that equivalent access to the facility ... is thereby provided." *Id.*

is not a contradiction to say that additions are both regarded as alterations and subject to the standards for new construction. This view favors the Authority's interpretation.

Both additions and alterations must meet the standards for new construction. ADAGG § 4.1.5; ADAGG § 4.1.6(b). One of these standards is that an elevator must serve all levels, including mezzanines. ADAGG 4.1.3(5). But alterations get a special exception to this rule. In alterations, platform lifts may always be used instead of elevators. ADAGG 4.1.6(g). Since additions are to be regarded as alterations, they get the benefit of the exception as well. ADAGG § 4.1.5. Therefore, if platform lifts may always be used instead of elevators in additions, the Authority need not install an elevator. It is not so simple as it seems.

There is a problem with the syllogism that supports the Authority. The Title III regulations say that the rules governing alterations do not require the installation of an elevator in small buildings, *unless* the building happens to be an airport. 28 C.F.R. § 36.401(d)(2)(ii). This proposition implies that something in the rules for alterations normally *does* require the installation of an elevator when alterations are made to an airport. If the requirement is not the standards for new construction, then what is it?

The Justice Department's *Title III Handbook* provides an answer. In the Department's view, an elevator must be installed whenever an upper-floor alteration triggers the ADA's "path of travel" requirement. The triggering event happens when the altered space contains a "primary function." *See Title III Handbook* §§ III–6.2000 and III–6.3000; *see also* 42 U.S.C. § 12183(a)(2); ADAGG 4.1.6(2). The only exception to this rule is if the cost of an elevator is more than 20 percent of the total cost of the alteration.[3]

■ It is unclear to me why the Justice Department believes that a path of travel

must include an elevator. The definition of "path of travel" seemingly endorses the use of lifts. 28 C.F.R. § 36.403(e). Nevertheless, I am inclined to follow the Justice Department's interpretation. The Department wrote the regulations, and its interpretations are entitled to deference. *Paralyzed Veterans of America,* 950 F.Supp. at 392. Additionally, the Department has access to technical expertise which I do not. Although other interpretations are possible, I cannot say that the Department's interpretation is unreasonable.

■ Applying the Justice Department's interpretation to this case, the Authority is required to install an elevator if the restaurant is a "primary function" of the airport terminal. The regulations define a "primary function" as:

> [A 'primary function' is] . . . a major activity for which the facility is intended . . . [including] but not limited to, the customer services lobby of a bank, the *dining area of a cafeteria,* the meeting rooms in a conference center, . . . [and] offices and other work areas in which the *activities of the public accommodation* or other private entity using the facility *are carried out.* Mechanical rooms, boiler rooms, supply storage rooms, employee lounges or locker rooms, janitorial closets, entrances, corridors, and restrooms are not areas containing a primary function.

28 C.F.R. § 36.403(b)(Emphasis added). The *Title III Manual* has this to say:

> What is a primary function area? It is any area where a major activity takes place. It includes both the customer services areas and work areas in places of public accommodation.

The legislative history of the ADA reflects a similar view:

> Areas containing primary functions refer to those portions of a place of public accommodations where significant goods,

---

3. Section III–6.3000 of the *Title III Manual* contains the following discussion:

> Does [§ 36.401(d)(2)(ii) ] mean that . . . transit facilities have to install elevators every time they do alterations that would trigger a path of travel obligation involving vertical access? No. The 20 percent disproportionate limit dis-

cussed above applies and means that elevators are not required when installing them would exceed 20 percent of the cost of the original alteration (which will most often be the case). The 20 percent limit is found at 28 C.F.R. § 36.403(f).

services, facilities, privileges, advantages or accommodations are provided.

H.Rep. No. 485, 101st Cong., 2d Sess., pt. 2, at 112 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 486.

■ An airport restaurant meets the definition of "primary function." The definition of "primary function" includes all public areas of a building where business is conducted. Certainly, under an ordinary common-sense definition of the words, it is possible to conclude that a restaurant is not a "primary" function of an airport because it does not directly relate to the arrival and departure of airplanes. However, in this case, common sense appears to be at odds with the specific meaning of "primary function" under the ADA.

Assuming the restaurant is a primary function of the terminal, then the Phase I alteration triggers the path of travel requirement. Moving the restaurant to the mezzanine "affects ... access to an area of the facility containing a primary function." 42 U.S.C. § 12183; 28 C.F.R. § 36.403(a); ADAGG § 4.1.6(2). Therefore, under the Justice Department's interpretation of its rules, the Authority must install an elevator unless the cost would exceed 20 percent of the total cost of the alteration.

The parties have stipulated that the total cost of Phase I is $ 5.3 million. The $3.4 million cost of Phase II must be added to this figure because it is being undertaken within 3 years of the Phase I alteration. *See* 28 C.F.R. § 36.403(h). This brings the total cost to $8.7 million. If the cost of installing an elevator that serves the mezzanine would exceed 20 percent of this figure (approximately $1.8 million), the Authority would not need to install one.

The record does not establish how much an elevator would cost, but it is unlikely that it would cost $1.8 million. By way of comparison, Phase I included a new freight elevator that cost only $34,230.

The Authority makes one final argument that needs to be addressed. At oral argument, counsel asserted that the ADAGG are "flexible," are "only guidelines," and require only "reasonable" access for the disabled. I see no basis for this position. The Title III regulations require strict compliance with the letter of the ADAGG. 28 C.F.R. § 36.406(a). Counsel may be referring to ADAGG § 2.2, which allows departures from the ADAGG where alternative designs would provide substantially equivalent access. The ADAGG do not consider platform lifts to be substantially equivalent to elevators. If they did, the regulations would not place such severe restrictions on the use of lifts.

### III. CONCLUSION

Phase I of the addition to the Gallatin Airport Authority Terminal does not comply with the Americans with Disabilities Act's requirements for the use of elevators when there is an addition to an airport terminal. Therefore,

IT IS ORDERED that the Plaintiffs motion for summary judgment be, and the same hereby is, granted because the addition to the Gallatin County Airport does not comply with elevator requirements of 42 U.S.C. § 12101 et. seq. and the regulations and guidelines applicable here.

IT IS FURTHER ORDERED that the Defendant's motion for summary judgment be, and the same hereby is, denied;

IT IS FURTHER ORDERED that defendants are permanently and affirmatively EN-JOINED to redesign and construct the airport terminal, and the elevators providing access to the restaurant to comply with the Americans with Disabilities Act;

IT IS FURTHER ORDERED that within thirty [30] days after entry of this Order, defendants shall submit to the Court and to plaintiffs a written plan and architectural design that complies with the requirements of the Americans with Disabilities Act;

IT IS FURTHER ORDERED that plaintiffs shall have thirty [30] days thereafter in which to respond in writing to defendants' proposed plan and design.