**ASSOCIATION FOR DISABLED AMERICANS, INC., Daniel Ruiz, and Luis Rodriguez, Plaintiffs,**

v.

**CONCORDE GAMING CORPORATION and GOLDCOAST ENTERTAINMENT CRUISES, INC., Defendants.**

**No. 99–1058–CIV–HIGHSMITH.**

United States District Court,
S.D. Florida.

Aug. 20, 2001.

William Charouhis, Miami, FL, for Plaintiff.

Phillip Hudson, III, Lucio, Bronstein, et al., Miami, FL, for Defendant.

### FINDINGS OF FACT & CONCLUSIONS OF LAW

HIGHSMITH, District Judge.

THIS CAUSE came before the Court for a bench trial from July 31, 2001 to August 2, 2001. The issues tried to the Court concerned whether a casino vessel, the *Casino Princesa* (hereinafter the "*Princesa*"), was accessible to Plaintiffs Daniel Ruiz and Luis Rodriguez, in compliance with Title III of the Americans with

Disabilities Act of 1990 (hereinafter "Title III"), 42 U.S.C. §§ 12181–12189. Upon due consideration of the evidence adduced at trail and the pertinent authorities, the Court finds:

## I. FINDINGS OF FACT

### The Parties

1. Plaintiff Daniel Ruiz is a T–3 paraplegic and is wheelchair-bound. He is a founder, a member, and the current president of the Association for Disabled Americans, Inc. He has sailed on the *Princesa*.

2. Plaintiff Luis Rodriguez is a quadriplegic and is wheelchair-bound. He is a founder, a member, and a current board member of the Association for Disabled Americans, Inc. He has sailed on the *Princesa*.

3. Plaintiff Association for Disabled Americans, Inc. is a nonprofit corporation organized under the laws of Florida, with approximately 250 members. Its mission is to combat discrimination against the disabled. Since it was established in 1995, the Association for Disabled Americans, Inc. and its members have instituted over 200 Title III access actions in the United States District Court for the Southern District of Florida.

4. Defendant Concorde Gaming Corporation, through wholly owned subsidiaries, controls Princesa Partners and Bayfront Ventures. Princesa Partners owns the *Princesa*, and Bayfront Ventures operates the *Princesa*.

5. Defendant Goldcoast Entertainment Cruises, Inc. previously owned a minority interest in both Princesa Partners and Bayfront Ventures. Concorde Gaming Corporation bought out Goldcoast Entertainment Cruises, Inc.'s interests in Princesa Partners and Bayfront Ventures in August of 2000. Goldcoast Entertainment Cruises, Inc. no longer has a stake in the ownership or operation of the *Princesa*.

### The Vessel

6. The *Princesa* was designed in 1997, and construction of the vessel was completed in 1998. She is 200 feet long, 41 feet wide, and contains four passenger levels or decks. From design through construction, the cost of building the *Princesa* was $7.2 million.

7. The *Princesa* was designed and constructed as a commercial, passenger vessel, in accordance with the United States Coast Guard regulations for subchapter K vessels. The *Princesa* can carry up to 600 passengers, plus 148 crew members.

8. The *Princesa* was designed and built to be a casino ship; i.e., to transport customers to and from international waters, where she serves as a casino and her passengers partake in casino gaming. The *Princesa*'s maiden voyage was in October of 1998, and, since that time, she has operated as a casino vessel open to the public from Miami's Bay Front Park.

9. Passengers purchase tickets and board the *Princesa* at Bay Front Park. When they arrive at the *Princesa*'s terminal at Bay Front Park, prospective passengers are met by "greeters." The greeters are customer service representatives who meet and offer assistance to passengers and prospective passengers. At the terminal, there is also a ticket booth, where passengers may purchase tickets. The counter at the ticket booth is 40 inches high from ground level and 6½ inches deep. Among the services that the greeters regularly perform is to assist disabled individuals with the transaction of purchasing a cruise ticket. Disabled individuals therefore are not required to utilize the ticket booth.

10. After a passenger has purchased a cruise ticket, the passenger embarks the

*Princesa* via a gangway that runs from ground level at Bay Front Park to the *Princesa*'s first passenger deck. The exact height and slop of the gangway vary, depending on the level of the tide. No evidence was presented at trial as to the mean height and slope of the gangway.

11. At the point of ingress to the *Princesa* on the first deck, there is a drop-off of approximately four inches from the point where the gangway meets the vessel to the interior passenger deck. This drop-off is required to make the doorway water-tight, in compliance with Coast Guard regulations.

12. Gaming is offered on the first and second decks of the *Princesa*. There are cashier counters on the first and second decks, where passengers may exchange cash for gambling chips, and vice versa. The cashier counters are approximately 41 inches high. They are required to be that high for security reasons.

13. The following games are available on the first and second decks: (1) black jack; (2) mini-baccarat; (3) roulette; and (4) craps. There are also slot machines on the first and second decks. Additionally, poker is occasionally available on the second deck. Two of the gaming tables on the first deck are lowered, so that they are accessible to individuals in wheelchairs. Those two tables may be utilized to play either black jack or mini-baccarat. All of the other tables are inaccessible to individuals in wheelchairs, due to the height of the tables.

14. Bar service is available on the first, second, and third decks of the *Princesa*. Passengers may obtain drinks either (1) directly from bars located on each deck or (2) from the vessel's wait staff. Food is sold on the second and third decks, or it may be ordered through the wait staff from the first deck. On the second and third decks, there are tables where passengers may eat and drink. On the first deck, there are no tables solely for eating and drinking (i.e., all of the tables are gaming tables). The two lowered gaming tables on the first deck, however, are outfitted with plexiglass tops, which may be affixed to allow people to eat and drink off of them. The *Princesa* has a policy of affixing the plexiglass tops to the lowered gaming tables when (1) requested by a passenger and (2) the vessel is not in international waters (i.e., when gaming is not permitted). In effect, during a typical five hour gaming cruise, the lowered gaming tables may be utilized with the plexiglass tops for 45 minutes on the way out to international waters and for 45 minutes on the way in.

15. The fourth deck of the *Princesa* is an open air observation deck. The second and third decks of the *Princesa* also have small open air observation areas. There is no open air observation area on the first deck of the *Princesa*. The only segment of the first deck that is not enclosed cannot be utilized as an observation area because Coast Guard regulations require that it remain clear, as it serves as the primary emergency evacuation point for the vessel.

16. On the third deck of the *Princesa*, there is a dance floor that is open to passengers. Music, most often through a diskjockey, is played on the third deck.

17. Passenger restrooms are available on the first and second decks of the *Princesa*. On each deck, there is one men's restroom and one women's restroom.

18. All of the restrooms have one stall that was designed to be handicap accessible. Those stalls are 60 inches wide and 60 inches long. The toilets are positioned in a rear corner of the stall. In all of the stalls, there is a "grab bar" on the wall immediately beside the toilet. None of the stalls has a grab bar on the wall behind the toilet. In the women's stalls, there is

also a grab bar on the wall on the opposite side of the toilet. Thus, in the women's stalls there are grab bars on opposite sides of the 60 × 60 stall, and in the men's stalls there is a single grab bar beside the toilet. The toilet paper dispensers are located on the stall door, across the stall from the toilet. There is also a coat hook on the stall door.

19. The toilet in the men's handicap accessible stall on the first deck is 16½ inches high, and the toilet in the women's handicap accessible stall on the first deck is 17½ inches high.

20. Each restroom also has one lavatory that is designed to be handicap accessible. In that respect, the lavatory is constructed so that there is open space between the sink and the floor, in order to allow an individual in a wheelchair to maneuver his legs under the sink to permit him to use the sink. The clearance under the sinks is approximately 6½ inches deep. Above the sinks are mirrors, and on an adjacent wall there are paper towel dispensers.

21. The *Princesa* does not have an elevator; therefore, the only way to get to the second, third, and fourth decks is via the vessel's stairways.

22. To retrofit the *Princesa* with an elevator would cost approximately $200,000.00. During the retrofitting the vessel would be in dry-dock and out of service for approximately two months, and the vessel would have to be re-certified by the Coast Guard following the retrofitting.

### Plaintiffs' Cruise on the *Princesa*

23. Plaintiffs Daniel Ruiz and Luis Rodriguez (collectively "Plaintiffs") have both taken one cruise aboard the *Princesa*. During their cruise, Plaintiffs were aboard the vessel for approximately six hours.

24. Plaintiffs required assistance to get up the gangway to the vessel. Once aboard the *Princesa*, Plaintiffs were con- fined to the first deck because there was no elevator to the upper decks.

25. Plaintiffs attempted to use the men's restroom on the first deck, but they could not utilize that facility. In that respect, the urinals were too high for Plaintiffs to evacuate their leg bags, and Plaintiffs could not transfer from their wheelchairs to the toilet in the handicap accessible stall. Plaintiffs also could not use the lavatory because there was not enough clearance under the sink, and they could not reach the paper towel dispenser because it was too high.

26. Plaintiffs played slot machines during the cruise. Plaintiff Daniel Ruiz wanted to play craps, but could not, because the tables were too high for him to see the playing surface or roll the die.

27. Plaintiffs attempted to use the bar on the first deck; however, it was too high for them to access. Plaintiff Daniel Ruiz later obtained a drink from a waitress, and Plaintiff Luis Rodriguez's wife got him a drink.

28. Plaintiffs did not eat aboard the *Princesa*. Plaintiff Daniel Ruiz did ask a waitress what kind of food was available, and he was told that only sandwiches were available and that they were not very good.

29. Plaintiffs also were unable to use the cashier counter on the first deck because it was too high.

### Expert Testimony

30. At trial, Michael Brennan (hereinafter "Brennan") testified as an expert on the *Princesa*'s accessibility for Plaintiffs, and Peter Manheimer (hereinafter "Manheimer") testified as an expert on the *Princesa*'s accessibility for Defendants. Brennan expressed the general opinion that the *Princesa* and her services are inaccessible to disabled individuals, while Manheimer expressed the opinion that the

*Princesa* and her services are generally accessible.[1]

31. To differing degrees, the experts based their opinions upon regulations for "landside" public accommodations issued by the United States Department of Justice.

32. Brennan and Manheimer agreed that it is impossible to make all aspects of a commercial, passenger vessel accessible to all disabled individuals. That is, there are some disabilities that are so severe that no alteration or modification will permit the individual to participate in a particular activity or utilize a facility.

33. Brennan and Manheimer also agreed that: (1) the toilet paper dispensers in the handicap accessible stalls are too far away from the toilets to be reached by individuals confined to wheelchairs; (2) the mirror in the women's first deck restroom is too high to be used by individuals in wheelchairs; (3) the paper towel dispensers in the restrooms are at a height that is difficult for individuals in wheelchairs to reach; and (4) the second, third, and fourth decks of the *Princesa* are inaccessible to individuals in wheelchairs.

34. Brennan opined that the exterior doors to the restrooms are too heavy and close too quickly to be used by individuals in wheelchairs, Manheimer disagreed.

35. Brennan opined that the first deck women's restroom does not have enough space to allow an individual in a wheelchair to open the exterior door easily when exiting the restroom, Manheimer disagreed.

36. Upon consideration of all their testimony, the Court found Manheimer to be the more credible witness than Brennan.[2]

## II. CONCLUSIONS OF LAW

### A. The Applicable Law: Title III

"Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 531 U.S. 1049, 121 S.Ct. 1879, 1889, 149 L.Ed.2d 904 (2001). Employment discrimination, discrimination by government entities, and discrimination by places of public accommodation are governed by separate titles of the ADA. *See id.* Title III, which applies to discrimination by places of public accommodation, is implicated by the instant case. Only injunctive and declaratory relief are available to private litigants who bring suit under Title III; i.e., money damages are not available. *See* 42 U.S.C. § 12188; *Powers v. MJB Acquisition Corp.*, 993 F.Supp. 861, 867 (D.Wyo.1998) ("Title III of the ADA does not provide for a private cause of action for damages").[3] Title III establishes the "[g]eneral rule" that:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases, (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a). This broad prohibition contains three essential elements that

---

1. The Court will not recount the two witnesses' testimony with respect to each aspect of the *Princesa*. Instead, the Court notes, in the text, their few areas of agreement and their testimony on matters not specifically addressed by the fact witnesses.

2. This finding is based upon the demeanor of the two witnesses, as well as the fact that

Brennan testified that he would only be compensated if Plaintiffs prevail in this lawsuit.

3. Monetary damages are available, in some instances, when an enforcement action is brought by the United States Attorney General. *See* 42 U.S.C. § 12188(b)(2)(B).

require further definition to understand the reach of Title III, namely (1) "discrimination" on the basis of (2) "disability" in (3) a "place of public accommodation."

■ For purposes of Title III, the term disability means "a physical or mental impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A). Major life activities are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 28 C.F.R. § 1630.2(i). "The phrase 'public accommodation' is defined in terms of 12 extensive categories, which the legislative history indicates 'should be construed liberally' to afford people with disabilities 'equal access' to the wide variety of establishments available to nondisabled." *PGA Tour, Inc.*, 121 S.Ct. at 1890 (footnote omitted). Those 12 categories are:

(A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;

(B) a restaurant, bar, or other establishment serving food or drink;

(C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;

(D) an auditorium, convention center, lecture hall, or other place of public gathering;

(E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;

(F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C. § 12181(7). Although Title III does not identify commercial, passenger vessels as covered public accommodations, the Eleventh Circuit has held that "those parts of a cruise ship which fall within the statutory enumeration of public accommodations are themselves public accommodations for purposes of Title III." *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1241 (11th Cir.2000) (per curiam); *see also id.* ("[A] public accommodation aboard a cruise ship seems no less a public accommodation just because it is located on a ship instead of upon dry land. In other words, a restaurant aboard a ship is still a restaurant."). Thus, the areas of commercial, passenger vessels that serve the public must comply with Title III's general rule prohibiting discrimination, on the basis of disability (i.e., a physical or mental impairment), in the provision of goods, services, facilities, privileges, advantages, or accommodations. *See id.* at 1241 n. 5 ("Only those portions of the cruise ship that come within the statutory definition of 'public accommodation' are subject to the public accommodation provisions of Title III. Other parts of a ship, such as the bridge, the crew's quarters, and the engine room, might not constitute public accommodations.").

■ As noted above, Title III establishes a general prohibition against "discrimination" on the basis of disability. Title III, of course, makes it illegal for a place of public accommodation to intentionally exclude individuals simply because they are disabled. *See* 42 U.S.C. § 12182(b)(1)(A). Title III's concept of discrimination, though, also extends to some forms of de facto discrimination. *See* 42 U.S.C. § 12182(b)(2)(A); *Parr v. L & L Drive–Inn Restaurant*, 96 F.Supp.2d 1065, 1069 (D.Haw.2000) ("The scope of the Act covers not only intentional discrimination, but also discriminatory effects of benign neglect, apathy, and indifference.") (internal quotations marks and citation omitted); *Indep. Living Res. v. Or. Arena Corp.*, 1 F.Supp.2d 1159, 1169

(D.Or.1998) ("Title III of the ADA outlaws not just intentional discrimination but also certain practices that have a disparate impact upon persons with disabilities even in the absence of any conscious intent to discriminate."). In that respect, the Supreme Court recently iterated that Title III "requires without exception that any policies, practices, or procedures of a public accommodation be reasonably modified for disabled individuals as necessary to afford access unless doing so would fundamentally alter what is offered." *PGA Tour, Inc.*, 121 S.Ct. at 1896 (internal quotation marks omitted). Additionally, Title III requires the removal of architectural or structural barriers that prevent access to public accommodations, when their removal is readily achievable.[4] *See* 42 U.S.C.

---

4. In the present case, there was considerable wrangling, pretrial, over whether this was an existing facility or new construction case. Title III and, particularly, its implementing regulations differentiate between facilities constructed prior to January 26, 1993 (so called existing facilities) and facilities designed and constructed for first occupancy after January 26, 1993 (so called new construction). *See generally Coalition of Montanans Concerned v. Gallatin*, 957 F.Supp. 1166, 1168 (D.Mont. 1997) ("The overall policy of the ADA is to require relatively few changes to existing buildings, but to impose extensive design requirements when buildings are modified or replaced."). This is because architectural barriers can be avoided at relatively little cost during the design and construction stage. *See Anderson v. Pa. Dept' of Pub. Welfare*, 1 F.Supp.2d 456, 464 (E.D.Pa.1998) (quoting 28 C.F.R. Pt. 35, App. A at 486). Therefore, the regulations that have been promulgated (1) mandate that new construction facilities be designed and constructed in accordance with the applicable guidelines and (2) do not allow for an undue hardship defense. *See Kinney v. Yerusalim*, 9 F.3d 1067, 1071 (3rd Cir.1993). Conversely, when a facility is constructed in accordance with the applicable architectural guidelines, no other design requirements may be imposed under Title III. *See Indep. Living Res. v. Or. Arena Corp.*, 982 F.Supp. 698, 746 (D.Or.1997). In other words, compliance with the Department of Justice guidelines

provides a type of safe harbor for the architectural design of newly constructed facilities. *See Lara v. Cinemark USA, Inc.*, 207 F.3d 783, 789 (5th Cir.2000).

There are, however, no applicable regulations for the construction or alteration of commercial, passenger vessels. *See Access Now, Inc. v. Holland Am. Line–Westours, Inc.*, 147 F.Supp.2d 1311, 1312–13 (S.D.Fla.2001) ("the DOJ and the DOT have been derelict in the exercise of their statutorily mandated duty to promulgate regulations, under the Americans with Disabilities Act of 1990 (the 'ADA'), regarding the alteration and construction of cruise ships"). In the absence of applicable guidelines, there are no minimum requirements to serve as a safe harbor for ship designers, builders, and operators/owners. *See id.* Consequently, the more demanding requirements for the design of new construction (i.e., no undue burden defense) imposed by Title III's implementing regulations may not be applied to vessels constructed after January 26, 1993, as it cannot be required that a vessel be designed and constructed in accordance with guidelines that do not exist. *See Lara*, 207 F.3d at 789 (refusing to apply sightline requirements that were not promulgated as regulations); *Indep. Living Res. v. Or. Arena Corp.*, 982 F.Supp. at 746 (same). The issue of whether this is a new construction or existing facility case is, therefore, of little moment. As previously noted, that distinction

§ 12182(b)(2)(iv). If removal is not readily achievable, the public accommodation must make its goods or services available to the disabled through alternative methods, if such alternative methods are readily achievable. *See* 42 U.S.C. § 12182(b)(2)(v). In no case, however, is a public accommodation required to make a modification or alteration, where allowing a disabled individual "to participate in or benefit from goods, services, facilities, privileges, advantages, or accommodations . . . [would] pose[ ] a direct threat to the health or safety of others." 42 U.S.C. § 12182(b)(3).

■ It is important to observe that the drafters of Title III were cognizant of the hardship that bringing unintentional violations into compliance could impose upon small businesses. *See Parr,* 96 F.Supp.2d at 1070 (citing ADA's legislative history). Therefore, they attempted to strike a balance between the concerns of small business owners and the interests of the disabled. The compromise that Title III makes is to require only *reasonable* modifications and *readily achievable* barrier removals or alternative methods, when the disabled are subjected to de facto discrimination in places of public accommodation.[5] "[A] reasonable modification is one that would not require fundamental alterations to a program, policy, or facility . . . ." *Powers v. MJB Acquisition Corp.,* 993 F.Supp. at 868 (citing 42 U.S.C. § 12182). "[T]he

determination of whether a particular modification is 'reasonable' involves a fact specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." *Staron v. McDonald's Corp.,* 51 F.3d 353, 356 (2d Cir.1995). Similarly, "[t]he term 'readily achievable' means easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). In *Doe v. Mutual of Omaha Ins. Co.,* 179 F.3d 557 (7th Cir.1999), Judge Posner explained, in practical terms, the balance struck by Title III:

The common sense of the statute is that the content of the goods or services offered by a place of public accommodation is not regulated. A camera store may not refuse to sell cameras to a disabled person, but it is not required to stock cameras specifically designed for such persons. Had Congress purposed to impose so enormous a burden on the retail sector of the economy and so vast a supervisory responsibility on the federal courts, we think it would have made its intention clearer and would at least have imposed some standards. It is hardly a feasible judicial function to decide whether shoestores should sell single shoes to one-legged persons and if so at what price, or how many Braille books the Borders or Barnes and Noble

---

becomes significant when applying Title III's design regulations. Here, there are no design regulations; therefore, the Court must apply, only, the barrier removal and modification provisions of Title III with their textual reasonableness/readily achievable component, as discussed above in the text. *See generally Lieber v. Macy's West, Inc.,* 80 F.Supp.2d 1065, 1077 (N.D.Cal.1999) (noting that even in new construction facilities, "[c]ontinued efforts are required . . . over time to remove any remaining barriers to the extent readily achievable").

5. As noted earlier, Title III's implementing regulations require strict compliance with the promulgated design standards and do not allow for an undue hardship defense for the failure to construct a new facility in accordance with those standards. *See supra* Note 4. This is not inconsistent with the reasonable/readily achievable balance for de facto violations discussed in the text. Rather, the failure to comply with promulgated regulations, which must go through a considerable vetting process before they take effect, may be viewed as intentional discrimination.

bookstore chains should stock in each of their stores....

*Id.* at 560. In sum, with respect to de facto violations, Title III only requires that places of public accommodation take remedial measures that are (a) effective, (b) practical, and (c) fiscally manageable.

### B. Title III Framework

Prior to trial, the Court advised the parties that the evidence would be assessed under the analytical framework set forth by the Fifth Circuit in *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052 (5th Cir.1997). That framework provides:

> The plaintiff has the burden of proving that a modification was requested and that the requested modification is reasonable. The plaintiff meets this burden by introducing evidence that the requested modification is reasonable in the general sense, that is, reasonable in the run of cases. While the defendant may introduce evidence indicating that the plaintiff's requested modification is not reasonable in the run of cases, the plaintiff bears the ultimate burden of proof on the issue. If the plaintiff meets this burden, the defendant must make the requested modification unless the defen-

dant pleads and meets its burden of proving that the requested modification would fundamentally alter the nature of the public accommodation.

*Id.* at 1059 (internal citations and footnote omitted); *see also Lieber*, 80 F.Supp.2d at 1077 (setting forth the same analytical framework for barrier removals).

### C. Application of Title III to the Instant Case [6]

#### Preliminary Matters: Jurisdiction, the Parties, Standing, and the Applicability of Title III

1. The Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question).

2. Plaintiff Daniel Ruiz is disabled for purposes of Title III, and he has standing to maintain his claim for the alleged discrimination he incurred aboard the *Princesa.*[7]

3. Plaintiff Luis Rodriguez is disabled for purposes of Title III, and he has standing to maintain his claim for the alleged discrimination he incurred aboard the *Princesa.*

4. Plaintiff Association for Disabled Americans, Inc. does not have standing to maintain a separate claim on behalf

---

6. To the extent that the Court's factual findings constitute legal conclusions, they are incorporated into these conclusions of law. To the extent that there are any additional findings of fact in this section, they shall have the same effect as if listed in the findings of fact above.

7. With respect to Plaintiffs Daniel Ruiz and Luis Rodriguez's standing, the Court notes that they did not take their cruise upon the *Princesa* until approximately one week before the trial of this matter, long after the case had been filed. If that was their only experience with the *Princesa,* they would not have standing to prosecute this action, as a party's standing is determined as of the time of the filing of the complaint. *See Moyer v. Walt Disney World Co.,* 146 F.Supp.2d 1249, 1253–

54 (M.D.Fla.2000) (granting partial summary judgment due to lack of standing in Title III case, where the plaintiff had not visited certain of the defendant's theme parks until after the litigation was initiated). Both Ruiz and Rodriguez testified, however, that they attempted to take a cruise aboard the *Princesa* prior to filing this action. They aborted that cruise, after inspecting the vessel and determining that it was inaccessible. According to their trial testimony, Ruiz and Rodriguez took the cruise shortly before trial because the *Princesa* 's management had represented that the vessel had been made accessible. Since Title III provides prospective relief, the Court has addressed the issues of accessibility as of the time of Ruiz and Rodriguez's cruise, which reflects the vessel's current condition.

of its members because "any finding of an ADA violation requires proof as to each individual claimant." *Concerned Parents to Save Dreher Park v. City of W. Palm Beach,* 884 F.Supp. 487, 488 (S.D.Fla. 1994).[8]

5. Defendant Concorde Gaming Corporation is an owner/operator of the *Princesa,* subject to liability under Title III. *See* 42 U.S.C. § 12182(a).

6. Defendant Goldcoast Entertainment Cruises, Inc. is not an owner/operator of the *Princesa* and is not subject to liability under Title III.

 7. The casino, restaurant, bar, and observation areas on the first, second, third, and fourth decks of the *Princesa* are public accommodations subject to Title III. *See Stevens v. Premier Cruises, Inc.,* 215 F.3d 1237, 1240–41. The *Princesa*'s terminal at Bay Front Park is a public accommodation subject to Title III.

 8. The unenclosed area on the first deck of the *Princesa* is not a public accommodation subject to Title III. *See id.* at 1241 n. 5.

### The Bay Front Park Terminal & the Gangway

 9. Plaintiffs take issue with the height and width of the *Princesa*'s ticket counter located at Bay Front Park. Plaintiffs, though, failed to present evidence that they suffered discrimination as a result of the height or width of the ticket counter. The uncontroverted evidence

was that greeters meet and assist disabled passengers with the purchase of tickets. Moreover, Plaintiffs reported no trouble in purchasing their tickets. Thus, they have failed to establish any discrimination with respect to the ticket counter.

 10. Plaintiffs also failed to satisfy their burden with respect to the gangway from Bay Front Park to the *Princesa.* Plaintiffs testified that the slope of the gangway was too steep for them to negotiate it without assistance. The modification proposed by Plaintiffs was to replace the gangway with a ramp with a more gradual slope. Plaintiffs' proposed modification may be reasonable in the general sense (i.e., in the run of cases). It does not, however, take into account the particular facts of the present case, namely that the slope of the gangway is dependent upon the level of the tide and, thus, the slope varies from hour to hour. Regardless of the ramp utilized, when the tide is high the gangway will be steeper than when the tide is low. Plaintiffs' proposed modification presupposes that the slope of the gangway is a constant variable, which may be corrected by simply replacing the current ramp with a more gradual one. In the present case, the slope is not a constant, and Plaintiffs have offered nothing to provide for the variations in the slope. Thus, variations of and periodic difficulties with the slope would persist. Under these circumstances, Plaintiffs have not proffered an effective alteration.

---

**8.** At trial, Plaintiffs solicited expert testimony concerning accessibility issues related to a variety of disabilities (presumably on the theory that the Association for Disabled Americans, Inc. could represent the interests of all disabled individuals). For example, there was testimony concerning whether the televisions aboard the *Princesa* were unaccessible to hearing impaired individuals due to a lack of closed captioning. Similarly, there was testimony concerning the lack of Brail signs

for seeing impaired individuals. As neither Plaintiff Daniel Ruiz nor Plaintiff Luis Rodriguez introduced evidence of a disability other than paralysis, the Court will not consider the *Princesa*'s compliance with Title III in regards to other disabilities, as no such claims are properly before the Court. In other words, the issues in this case are limited to whether Ruiz and/or Rodriguez suffered discrimination in violation of Title III.

## Access to the Second, Third, and Fourth Decks & Alternative Methods

■ 11. Plaintiffs seek access to the second, third, and fourth decks of the *Princesa* through the installation of an elevator. As noted above, Title III requires readily achievable barrier removals, and readily achievable is statutorily defined as "accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). Installation of an elevator would (1) cost approximately $200,000.00, (2) require the *Princesa* to be in dry-dock for two months during the installation, and (3) require the *Princesa* to be re-certified as a commercial, passenger vessel by the Coast Guard. In short, installation of an elevator would be both extremely difficult and expensive. Installation of an elevator is, therefore, not readily achievable and Plaintiffs are entitled to no such relief.

12. Plaintiffs also seek to have the services and facilities available on the second, third, and fourth decks provided, through alternative means, to disabled passengers who cannot access those decks. More specifically, Plaintiffs seek alternatives to the: (1) restaurant service available on the second and third deck; (2) the observation areas; and (3) the dance floor/entertainment available on the third deck. These three facets of the vessel will be addressed separately.

■ a. Restaurant Service. The *Princesa* currently has a policy of allowing customers to order food that is available on the second and third decks from the first deck, through the wait staff. During the initial 45 minutes and final 45 minutes of a cruise, the lowered gaming tables on the first deck are available for customers to eat from them. The *Princesa*'s provision of dining services on the first deck is reasonable and it satisfies Title III as an alternative method. Plaintiffs are entitled

to no other alternative means of food service.

b. Observation Decks. At trial, Plaintiffs' counsel conceded that there was "no fix" for the observation decks. As Plaintiffs have offered no alternative, they have not met their burden and are entitled to no relief.

■ c. Dance Floor/Entertainment. On the third deck of the *Princesa*, there is a dance floor, where music is usually played during a cruise. Plaintiffs seek an alternative method to enjoy this feature. The only method proposed at trial was to create a dance floor on the first deck and transmit the music from the third deck to the first deck. Given the limited space on the vessel, the construction of a dance floor on the first deck would significantly impinge upon the area available for gaming—the primary function of the vessel. This would fundamentally alter the nature of the gaming offered aboard the *Princesa*. Moreover, the cost of constructing a dance floor would be considerable, and a dance floor, with piped in music, in the midst of a casino would likely not be a comparable or effective alternative. In light of the limited space on the first deck and the fact that the primary evacuation point for the vessel is located on the first deck, the Court also has concerns that placing a dance floor there would pose a threat of safety to the passengers. *See* 42 U.S.C. § 12182(b)(3). Thus, Plaintiffs are entitled to no relief with respect to the dance floor/entertainment on the third deck.

In sum, Plaintiffs failed to proffer a readily achievable alternative for any of the services or facilities available on the second, third, and fourth decks, which are not available on the first deck.

### Services on the First Deck

13. Plaintiffs maintain that the bar and cashier counter on the first deck are inaccessible because of the height and width of their respective counters.

14. As with the food service, the *Princesa* provides bar service through its wait staff. This is a reasonable alternative method, and it satisfies Title III. Plaintiffs are therefore entitled to no further relief with respect to the bar on the first deck.

15. As for the cashier counter, Plaintiffs have failed to satisfy their burden of proof, because they did not proffer a reasonable modification or alternative method. Plaintiffs proposed lowering the cashier counter. Aside from the costs involved, this modification is not reasonable in the instant case because there was testimony that the cashier counter is required to be its current height for security purposes. Plaintiffs failed to refute this evidence and offered no other reasonable alteration or modification.

### The Gaming

16. At trial, Plaintiffs' counsel stated that the only issue with respect to the gaming activities concerned the accessibility of the craps tables. Therefore, the Court will not address the accessibility of the other casino games or the slot machines.

17. Plaintiffs maintain that the craps tables are inaccessible because the areas designated for players to roll the dice, place wagers, and observe the game are too high to allow individuals in wheelchairs to participate. Plaintiffs proposed two modifications to cure this problem. First, Plaintiffs contend that wheelchair players could be permitted to play at the areas on the craps table designated for the game's attendants, the two croupiers and the stickman, where the railing is lowered. Second, Plaintiffs aver that the table's railing could be lowered at other spots or the entire table could be lowered.

18. Neither of Plaintiffs' proposed modifications of the craps tables is viable, because both would fundamentally alter the nature of the game. In *PGA Tour, Inc.*, the Supreme Court recently explained, in the context of golf, what constitutes a fundamental alteration of a game for purposes of Title III.[9] *See* 121 S.Ct. at 1893–97. Although the Supreme Court

---

9. In dissent in *PGA Tour, Inc.*, Justice Scalia makes a powerful argument that judicial interpretation of the "essential elements" of a game is unwise, unworkable, and most importantly unauthorized by Title III. *See* 121 S.Ct. at 1901–04 (Scalia, J., dissenting). The ultimate issue in *PGA Tour, Inc.* was whether providing a golfcart to a disabled golfer fundamentally altered the nature of professional golf, given that the PGA Tour and Nike Tour rules mandate that competitors walk the course during tournaments. *See* 121 S.Ct. at 1885 & n. 4. The majority concluded that walking was not an essential element of the game of golf and, therefore, held that providing a golf cart to a disabled competitor was required by Title III, as it was a reasonable modification that did not fundamentally alter the nature of the game. *See id.* at 1893–97. In his dissent, Justice Scalia poignantly noted the hazards created by the Court's decision:

> The [majority] ... concludes, and it will henceforth be the Law of the Land, that walking is not a "fundamental" aspect of golf.

Either out of humility or out of self-respect (one or the other) the Court should decline to answer this incredibly difficult and incredibly silly question. To say that something is "essential" is ordinarily to say that it is necessary to the achievement of a certain object. But since it is the very nature of a game to have no object except amusement (that is what distinguishes games from productive activity), it is quite impossible to say that any of a game's arbitrary rules is "essential." Eighteen-hole golf courses, 10–foot–high basketball hoops, 90–foot baselines, 100–yard football fields- all are arbitrary and none is essential....

...

[The majority's decision] means that future cases of this sort will be numerous, and a rich source of lucrative litigation. One can envision the parents of a Little League player with attention deficit disorder trying to convince a judge that their son's disability makes it at least 25% more difficult to hit a pitched ball. (If they are successful, the

held that waving the PGA tour's walking requirement would not fundamentally alter the game of professional golf, it explained that there are two ways in which a modification could fundamentally alter a game:

> In theory, a modification of petitioner's golf tournaments might constitute a fundamental alteration in two different ways. It might alter such an essential aspect of the game of golf that it would be unacceptable even if it affected all competitors equally; changing the diameter of the hole from three to six inches might be such a modification. Alternatively, a less significant change that has only a peripheral impact on the game itself might nevertheless give a disabled player, in addition to access to the competition as required by Title III, an advantage over others, and for that reason, fundamentally alter the character of the competition. . . .

*Id.* at 1893 (footnote omitted). Thus, a modification alters the fundamental nature of a game if it either (a) changes an essential aspect of the game that affects all competitors or (b) provides the disabled player with an advantage over the non-disabled players.

In the present case, both of Plaintiffs' proposed modifications would alter a fundamental aspect of craps—the dimensions by which the game is played. Craps is a common casino game, and it is played under common conditions, including the positioning of the players and the boundaries

of the playing surface. Lowering the rail of a craps table or lowering the entire table would alter the playing surface in a manner that is the equivalent of changing the dimensions of a playing field or the size of the diameter of a golf hole. Similarly, moving one of the croupiers or the stickman from his designated spot on the table to another spot would change the dimensions of where competitors play. Moving a croupier or the stickman would also require lowering the railing of the table on the spot that he is moved to, further distorting the playing surface. Moreover, allowing disabled players to play from a spot on the table that other players cannot play from may provide the disabled players with an advantage not enjoyed by the other players. As Plaintiffs' proposed modifications of the craps tables would fundamentally alter the nature of the game, Plaintiffs are entitled to no relief with respect to the craps tables.

### The First Deck Restrooms [10]

19. A Title III violation "does not occur only when a disabled person is completely prevented from enjoying a service, program, or activity." *Shotz v. Cates,* 256 F.3d 1077 (11th Cir.2001). If a public accommodation's restrooms are "unfit for the use of a disabled person," the public accommodation is not accessible. *See id.*

20. In the present case, Plaintiffs both testified that they could not transfer onto the handicap toilet because there was no garb bar behind the toilet.[11] Additionally,

only thing that could prevent a court order giving the kid four strikes would be a judicial determination that, in baseball, three strikes are metaphysically necessary, which is quite absurd.)

*Id.* at 1903–04 (Scalia, J., dissenting). The instant dispute over accessibility to the craps tables resinates with the justiciability concerns identified by Justice Scalia in *PGA Tour, Inc.* This Court, though, is bound to apply Title III as construed by the *PGA Tour, Inc.* majority and determine whether Plaintiffs' proposed modifications would fundamentally

alter the game of craps. The Court notes that this determination is made even more difficult, in the present case, because the parties failed to introduce any evidence as to the rules of craps.

10. The Court has limited its consideration to the first deck restrooms, because the second deck is inaccessible to wheelchair bound individuals, such as Plaintiffs.

11. Plaintiffs also testified that could not evacuate their leg bags in either the urinals or the

Defendants' expert conceded that: (1) the toilet paper dispensers are inaccessible to individuals in wheelchairs; (2) the mirror in the women's restroom is not usable by individuals in wheelchairs; and (3) the paper towel dispensers are at height difficult for individuals in wheelchairs to reach. It was also uncontested that the coat hooks in the handicap accessible stalls are too high for individuals in wheelchairs to utilize.[12]

■ 21. The deficiencies noted in paragraph 20 above render the restrooms inaccessible. Plaintiffs proposed remedying these problems by: (a) installing grab bars behind the handicap accessible toilets; (b) moving the toilet paper dispensers in the handicap accessible stalls so that they are located on the wall adjacent to the toilet; and (c) lowering (1) the mirror in the women's restroom, (2) the paper towel dispensers in the restrooms, and (3) the coat hooks in the handicap accessible stalls. These remedies are readily achievable in the general sense, and Defendants offered no evidence to establish that they are unreasonable in this case. Plaintiffs have, therefore, satisfied their burden of proof with respect to the rear grab bars, the toilet paper dispensers, the mirror in the women's restroom, the paper towel dispensers, and the coat hooks. Defendant Concorde Gaming Corporation will be ordered to remedy those violations.

22. At trial, there was conflicting expert testimony concerning the weight and closing speed of the restroom doors. Similarly, there was conflicting expert testimony with respect to whether the space in the women's restroom was sufficient to allow an individual in a wheelchair to exit the restroom easily. As noted above, the Court found Defendants' expert to be more credible than Plaintiffs' expert, and with respect to the bathroom doors and the space in the women's restroom the Court accepts the testimony of Defendants' expert. Accordingly, the Court finds that Plaintiffs have failed to satisfy their burden of demonstrating that they were denied access (i.e., discriminated against) due to (a) the weight and/or speed of the restroom doors or (b) the space in the women's restroom.

■ 23. Finally, there is the issue of the clearance under the handicap accessible lavatories. Like the issues of the weight and closing speed of the bathroom doors, the clearance controversy was spawned primarily by Plaintiffs' expert's inspection and testimony, rather than Plaintiffs' experience aboard the *Princesa*. Plaintiffs' expert averred that the lavatories are inaccessible to individuals in wheelchairs because there is not a full eight inches of clearance. Defendants' expert countered that, while there may not be a full eight inches of clearance, there is adequate clearance under the handicap accessible lavatories to allow most individuals in wheelchairs to use them. The only evidence as to the actual clearance was that it is approximately six and a half inches. There was no evidence that increasing the clearance by one and a half inches (i.e., to eight inches) would make

toilet in the handicap accessible stall. They could not utilize the urinals because the urinals were too high, and they could not utilize the toilet because they could not maintain their balance without a rear grab bar. The Court is requiring the installation of a rear grab bar; therefore, the issue of accessibility to the urinals is moot, as the toilet will now be accessible for purposes of evacuating Plaintiffs' leg bags. Moreover, Plaintiffs failed to produce evidence demonstrating that the installation of a lowered urinal is readily achievable.

12. To the extent that Plaintiffs, through their expert, raised an issue concerning the location of the toilets' handles (i.e., whether the handles are on the left or right side), the Court finds that Plaintiffs failed to satisfy their burden of proof with respect to that claim.

the lavatories significantly more usable by Plaintiffs. Under these circumstances, the Court finds that Plaintiffs have not satisfied their burden of demonstrating an effective alternative.

## III. CONCLUSION

As the undersigned has previously observed, the lack of regulations for commercial, passenger vessels renders compliance with and application of Title III an arduous task. *See Access Now, Inc. v. Holland Am. Line–Westours, Inc.,* 2001 WL 649158, at *1. In light of the ADA's mandate "for the elimination of discrimination against persons with disabilities," 42 U.S.C. § 12101(b), it is a task, though, that can no longer be delayed. Therefore, the Court has endeavored to apply Title III's reasonable modification and readily achievable barrier removal provisions to the facts of this case.

The evidence adduced at the trial demonstrated that the owners/operators of the *Princesa* undertook considerable efforts to design and construct the vessel to be as accessible as possible. Moreover, the evidence revealed that the *Princesa* has in place reasonable policies to make her services available to disabled individuals. These efforts resulted in a vessel that is largely complaint with Title III. There are, nonetheless, some areas in which the *Princesa* is inaccessible, namely the first deck restrooms. As remedies for those problems are readily achievable, they must be undertaken to make the *Princesa* compliant with Title III. Accordingly, Defendant Concorde Gaming Corporation is ORDERED to make the following alterations to the first deck restrooms within 90 days of this order:

1. install grab bars not less than 24 inches in length behind the toilets in the handicap accessible stalls;

2. install toilet paper dispensers on the wall adjacent to the toilet in the handicap accessible stalls;

3. lower the coat hooks in the handicap accessible stalls to a height not exceeding 54 inches from the floor;

4. lower the paper towel dispensers so the towels are not more than 54 inches from the floor; and

5. lower the mirror in the woman's restroom to the level of the mirror in the men's restroom.

Plaintiffs' claims are denied in all other respects. Pursuant to Rule 58 of the Federal Rules of Civil Procedure, the Court will enter separate final judgments consistent with this order.