ASSOCIATION FOR DISABLED AMERICANS, INC., Michelle Wisnewski and Daniel Ruiz, Plaintiffs,

v.

KEY LARGO BAY BEACH, LLC, and Key Largo Management Corporation, d/b/a Marriott Key Largo, Defendants.

Association for Disabled Americans, Inc. v. Key Largo Bay Beach, LLC

No. 04–10081CIV.

United States District Court, S.D. Florida.

Dec. 16, 2005.

Rhonda A. Anderson, Esq., Rhonda A. Anderson, P.A., Coral Gables, FL, Counsel for Plaintiff.

Casey Walker, Esq., Murphy & Walker, P.L., Vero Beach, FL, Counsel for Defendant.

## *MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW AND FINAL JUDGMENT*

JAMES LAWRENCE KING, District Judge.

This is the third case against the Key Largo Marriott Hotel brought by individuals and associations of disabled Americans seeking attorney's fees, costs of litigation, and injunctive relief.

The Defendant Hotel settled the first case with a payment of substantial attorney's fees and costs of litigation, admission of non-compliance with Title III of the Americans with Disabilities Act and a stipulated Final Judgment requiring the Defendant Hotel to remove all barriers to disabled access necessary in order to bring the hotel into full compliance with ADA.

The second case was also settled by the Defendant Hotel with (again) the payment of substantial attorney's fees and costs of litigation, admission of non-compliance with the provisions of the ADA and submission to a Final Judgment mandating removal of any and all barriers to access by the disabled to bring the hotel resort complex into full compliance with the ADA.

The third case alleging the same denial of access by disabled Americans and seeking substantially the same injunctive relief for removal of any and all barriers to access under the ADA was tried in a six-day non-jury trial.

### *DESCRIPTION OF PROPERTY*

The Key Largo Bay Beach Marriott Hotel is a large beach hotel-resort located at approximately Mile Marker 103 on the Overseas Highway on the Island of Key

Largo, Florida. The Hotel, constructed between July 3, 1991 (date of application for permit to construct filed with Monroe County) (Tr., p. 281) and the date of the issuance of the Certificate of Occupancy by Monroe County on July 2, 1993 consists of nine separate modern buildings located on several acres of bayfront oceanfront frontage. There are 153 hotel guest rooms including 20 two-bedroom suites, several swimming pools, dining rooms, guest shops, bars and public areas generally associated with the operation of a first-class hotel. (Def. Exh. No. 2 and Pl. Exh. No. 12–92 pictures of the hotel and complex).

### THE THREE LAWSUITS

### (Multiple Filings for Same Barriers Under ADA)

### I. THE FIRST SUIT (ROETTGER CASE)

During the eight years following its opening as a public hotel and resort, there were no complaints by individual disabled Americans or organizations of the existence of any discriminatory barriers prohibited by the ADA. However, on July 28, 2000, the Defendant Hotel property was sued by a group of disabled Americans in a case entitled *Advocates for the Disabled, Inc., Steven Brother, et al. v. Resort Key Largo, Inc., et al.* before the Honorable Norman C. Roettger (Case No. 00–10055–CIV–ROETTGER, 2000 WL 34460793 (S.D.Fla. 2000)) (Def.Exh. No. 1). The Complaint in that case alleged discriminatory barriers at Defendant's property constituting 20 ADA violations (Comp. at pp. 6–9).

Throughout this period of time of construction and early operation of the Hotel, it was owned and operated by Mr. Gus Boulis who, on behalf of the Hotel property, stipulated to an agreed settlement of all claims of ADA violations and agreed to complete over 60 repairs, modifications and corrections to the Hotel property, necessary to bring it into full compliance with the Americans with Disabilities Act by October 2002.

Judge Roettger approved the settlement, ordered compliance with its terms, including removal of all the barriers on the Hotel property by the specified date, and dismissed the case on April 17, 2001. (D.E. No. 27).

Very importantly, in this first case against the Defendant Hotel property under the ADA, the final injunctive order entered by Judge Roettger retained jurisdiction to enforce the terms of the injunctive order.

After the settlement of all issues and entry of the final injunctive order mandating the Defendant Hotel to bring its property into full ADA compliance, Plaintiffs' counsel, having been paid substantial attorney's fees, costs and expenses, exited the scene and have not been heard from since.

Although the stipulated agreed and mandated order to remove all 60 ADA barriers were not completed by Mr. Boulis, he had commenced making the improvements to the Key Largo Marriott Hotel.

The owner and principal moving force behind the construction and operation of this Hotel who had settled the Roettger case with the Advocates for the Disabled was brutally murdered in what was reported in the press to be a gang-land assassination as he was leaving his Ft. Lauderdale office one evening in the Fall of 2001. The assets of the estate of the murdered man, Boulis, including his ownership interest of the Key Largo Bay Beach Resort Hotel, became embroiled in contested state court litigation. This included a receivership of the property that is the subject-matter of this suit. (Blackburn Tr., 6:20).

Mr. Walsh's testimony (Tr., p. 564) suggests that this is apparently the reason that the modification and removal of barri-

ers ordered by Judge Roettger were not completed. Plaintiff's counsel in the Roettger case made no effort to enforce by contempt the mandated provisions of the final injunctive order. This, in spite of the fact that Judge Roettger had retained full jurisdiction to enforce his decree.

The testimony of Michael P. Walsh (Tr., p. 564) reflects that he and his associates purchased part of the subject property from the Court Receiver and assumed management of the hotel. When purchased, the property was facing foreclosure as a result of the litigation, the receivership of the Hotel property, and the terrorist attacks of September 11, 2001, which had created confusion and uncertainty throughout the tourist industry. Michael P. Walsh, President of Ocean Properties Limited, became involved with the property at this time and did not, in fact, know of the prior (Roettger) case until 2003. (Tr., p. 568).

## II. *THE SECOND SUIT (MOORE CASE)*

The Key Largo Bay Beach Hotel was sued for a second time two months after the Hotel had been ordered to complete renovations to bring the Hotel with full ADA compliance in the Roettger case. This case, *Steven Brother v. Twin Harbors, Inc., Key Largo Bay Beach, LLC and Marrkey, LLC d/b/a Key Largo Bay Marriott Beach Hotel* (Case No. 03–10002–CIV–MOORE, 2003 WL 23765599 (S.D.Fla. 2003)) alleges the same discriminatory barriers in violation of the ADA that had been the subject of the first suit settlement and final injunctive decree by Judge Roettger.

## A. Failure to Inform Court of Roettger Case

Plaintiff's counsel did not advise the Court, as he is required to do [1], that this same Defendant Key Largo Bay Beach Hotel, had already been permanently enjoined from violating ADA provisions and had been ordered to bring the property into full compliance. (Moore case, D.E. No. 1—Civil Cover Sheet).

By leaving blank Section VIII of the Civil Cover Sheet, counsel was apparently

1. ORDER IN RE: Transfers of similar actions and proceedings, Southern District of Florida Administrative Order 88–30
   "**RULE 3.9 TRANSFER OF REFILED AND SIMILAR ACTIONS AND PROCEDURES**
   **A. Refiled.** Whenever an action or proceeding is terminated by entry of a notice or order of dismissal and is refiled without a substantial change in issue or parties, it shall be transferred to the Judge to whom the original was assigned.
   **C. Similar.** Whenever an action or proceeding is filed in the Court which involves subject matter which is a material part of the subject matter of another action or proceeding then pending before this Court, or for other reasons the disposition thereof would appear to entail the unnecessary duplication of judicial labor if heard by a different Judge, the Judges involved shall determine whether the newly filed action or proceeding shall be transferred to the Judge to whom the earlier filed action or proceeding is assigned.
   **D. Notice to Court.** It shall be the continuing duty of the Clerk and of the attorneys of record in every action or proceeding to bring promptly to the attention of the Court and opposing counsel the existence of other actions or proceedings as described in paragraphs A, B, and C hereof, as well as the existence of any similar actions or proceedings then pending before another court or administrative agency. Such notice shall be given by filing with the Court and serving on counsel a "Notice of Pendency of Other Actions," containing a list and description thereof sufficient for identification."
   Revised Rules were adopted February 15, 1993 without any change (except number) of this Rule.

following the general practice of lawyers specializing in ADA cases in the Southern District of Florida. He simply was doing what all of the lawyers were doing at that time resulting in a tangled and chaotic problem of multiple subsequent filings for the same alleged violations on the same property by different Plaintiff Disability groups.

Since none of the lawyers brought the failure of the parties to complete the improvements ordered in the first case, Judge Moore was unaware of the Roettger case. Now, another ADA association has sued the same Defendants and same property, again for the same barrier violations, but before a different (third) Judge. The (new) Judge is, of course, not informed of the prior suits, prior injunction orders or failure to remove the same barriers. Counsel, in this case (third) did not notify the Court of the two prior cases and final judgments. As a result of this questionable practice the undersigned Judge now requires that the plaintiff's attorney in all ADA cases file a certificate of counsel stating whether or not there has ever been any prior filings against the parties or property at issue in the most recently filed case.[2]

### B. The Settlement of the Moore (Second) Case

This case, like its predecessor case against the same property for the same violations was settled in a 43–page Stipulation for Settlement between the parties on October 14, 2003. The written Stipulation for Settlement set forth in explicit detail each modification that the Defendant Hotel was required to make to the Key Largo Bay Beach Hotel and Resort to bring it into full compliance with the ADA. (Pl. Exh. No. 2). The parties jointly gave notice to Judge Moore of the Stipulation for Settlement and provided him a copy for his *in camera* inspection.

Judge Moore's Final Injunctive Order of Dismissal entered the following day provided in part "This Court has reviewed the Stipulation for Settlement entered into between the parties *in camera,* and hereby approves the Stipulation for Settlement and directs the parties to comply therewith. The Court retains jurisdiction over this matter for the purpose of enforcement of the Stipulation for Settlement for 210 days . . ."

Although the Stipulation for Settlement states "The alterations and modifications required hereby shall be completed in all respects by November 30, 2003," it is clear from the testimony and evidence presented at the trial of the above-styled case that this was a scrivener's error. The date for completion of the modifications on the copy furnished to the Defendant Hotel principals was November 30, 2004. The Court finds that the correct date for making the modifications ordered by Judge Moore is November 30, 2004.

The Defendant Hotel paid the stipulated attorney's fees, litigation costs and expenses[3] mandated by their settlement agreement and the Court order of $48,652.90 (D.E. No. 72) and, like the predecessor lawyers in the Roettger case, exited the scene. Nothing further was heard

---

2. Judge Moreno and Judge Dimitrouleas enter similar orders and make the same requirement of Plaintiff's counsel, in ADA cases. *See Disability Advocates v. Georgina Betancourt* (Case No. 05–20893–CIV–MORENO) and *Disability Advocates, et al v. Mayo Plaza, Inc.* (Case No. 05–60708–CIV–DIMITROULEAS).

3. Additional sums were paid by Defendant; $11,000 (for delay in paying $48,652.90) (Walsh Tr., 6:40); $15,000 costs and fees (Walsh Tr., 6:45); $9,000 to Steven Brother for liquidated damages (Walsh Tr., 6:46); total approximately $83,000.

from counsel by way of taking any steps to seek an order of contempt against the Defendant Hotel for its failure to complete the repairs the Defendant Hotel had agreed to do, and the U.S. District Court had now twice mandated be done, until they were contacted in September 2004 (11 months later) by defense counsel in the above-styled (King) case.

Mr. Michael P. Walsh, President of the property owning the Key Largo Bay Beach Hotel Resort complex and its managing officer on the premises testified at the trial of the above-styled case that he knew, and indeed signed the settlement agreement in the Moore case. (Trial Tr., p. 569). He testified that although his company (Ocean Properties) had spent well over $150,000 to make the ADA modifications and corrections (Tr., p. 568), on the over 2,000 items of modifications that had been accomplished to the date of his testimony at the trial, that unforeseen delays had prevented full compliance with the Moore case Final Injunctive Order and settlement. He testified that the Defendant encountered delays in bringing the Hotel into full compliance with the ADA were caused by "the hurricane and evacuations that we had, the availability of materials, the ability to obtain permits that were supposed to be 10–day permits that were sometimes ten weeks to five months, and the availability of labor to do the work and the reasonableness of the price." The Court finds this testimony to be truthful, accurate and unrebutted.

### III. *THE THIRD SUIT (KING CASE)*

The Key Largo Bay Beach Hotel was sued for a third time on September 10, 2004 in *Association for Disabled Americans, Inc., Michelle Wisnewski and Daniel Ruiz v. Key Largo Bay Beach, LLC, and Key Largo Management Corporation, d/b/a Marriott Key Largo* (Case No. 04–100081–CIV–KING, 2004 WL 2663257 (S.D.Fla. 2004)). This case, unlike the filing of the Moore case two months after the completion date for the renovations of the Hotel, was actually filed three months *prior* to the time mandated by Judge Moore for completion of all renovations to bring the Hotel within full compliance of ADA. Stated differently, the Defendant Hotel still had remaining, under the terms of its settlement and with full agreement of lawyers for the Plaintiff in the Moore case two months and twenty days left within which to make all the renovations. According to Mr. Walsh's testimony at the trial of this third case, the Hotel was engaged in complying with its stipulated agreement and the mandate of Judge Moore when this (third) suit was filed. (Trial Tr., pp. 568–569).

On the date this case was filed, both the Roettger and Moore cases were settled upon Defendant's agreement to remove the existing barriers and final permanent injunction against defendant was entered by two different Judges in two prior suits.

### A. Failure to Inform Court of Either Roettger or Moore Cases

Counsel for Plaintiffs in the above-styled case made no reference to the two outstanding final permanent injunctions by advising the Court of these critical facts on the Civil Cover Sheet, JS44, in which counsel is required to certify the existence of any related case.

This Court remained unaware of the entry of the Final Injunctive Orders in the two prior cases until Defendants filed, on October 29, 2004 and Answer and Affirmative Defense. With this background, the litigation commenced.

Although this third suit against the same Defendant property was nearly identical to the second and first suits filed before Judges Roettger and Moore in that

it was for the same cause of action, the same alleged violations of the ADA, the same discriminatory barriers, Plaintiffs' counsel did not, as she is required by law to do (*see supra*, pp. 1324–25) of either of the two prior cases, prior settlements and prior mandatory final injunctive orders of either Judge Roettger or Judge Moore.

Counsel, by leaving blank Section VIII of the Civil Cover Sheet, left the Court in a position where it was unaware of either the Roettger or Moore cases until those facts ultimately were revealed by defensive motions of the Defendant Hotel several months later.

Upon learning of the prior admissions of ADA violations by the Defendant and the two prior orders mandating the removal of barriers to bring the Hotel within compliance of the ADA, the Court directed the parties to seek enforcement of his order from Judge Moore. Because of the expiration of the 210–day retention of jurisdiction embodied in Judge Moore's Final Judgment of Dismissal and mandate to the Defendant, he rejected the application to look into the matter and review it for contempt.

Plaintiffs in this case, never elected to follow what seems to be a fairly obvious procedure of seeking enforcement of the Judge Roettger order through a motion for rule to show cause directed against the Defendant Hotel.[4] Any perceived defect prohibiting a U.S. District Judge from enforcing a lawful order mandating corrective actions to be taken under the ADA would not have been a bar, in any way, to the enforcement of Judge Roettger's order by the undersigned since Judge Roettger had retained full jurisdiction over the en-

forcement of that order. There is no jurisdiction limit on the Judge Roettger order, as there was on the Judge Moore order. This, nevertheless, was not done.

## IV.  *PRETRIAL ISSUES*

The parties have stipulated pursuant to Fed.R.Civ.P. 16 and Southern District Florida Rule L.R. 16.1E to the issues that remain for determination at trial.

The final pretrial stipulation of April 8, 2005 delineates clearly the factual and legal issues to be tried and determined by the Court. (D.E. No. 51). Under the Federal Rules of Civil Procedure and the Southern District of Florida, this stipulation controls the issues, the determination of which, will decide all issues in this case. We now turn to consideration of the issues that the parties have stipulated are the only remaining issues for determination by the Court.

### ISSUES OF LAW

The stipulated issues of law are:

A.  What standard of ADA compliance is applicable, i.e., whether Defendants are held to the standards of new construction, alterations to existing buildings, or are obligated only to remove barriers to disabled access where said removal is "readily achievable." Further, if new construction standards are required for barrier removal, if such new construction standards only apply to structures built and alterations made after January 26, 1992, or January 26, 1993 if Defendant has ten (10) or fewer employees and gross receipts of $500,000 or less.

---

4.  The First (Roettger case) *supra*, pp. 1323–24, had been, upon Judge Roettger's death, assigned by Chief Judge Zloch to Judge James

Lawrence King for all future proceedings. This case, of course, with full retention of jurisdiction is still under the specific supervi-

*See* 42 U.S.C. § 12181; 28 CFR § 36.508(a)

B. Whether Plaintiffs have standing based on their individual disabilities to complain about particular alleged "barriers" to disabled access at the property.

C. Whether any alleged barriers to access, noncompliance with ADAAG, or other conditions at the subject property give rise to liability under the ADA.

## A. Does the ADA Standard for Old or New Buildings Apply?

■ This issue concerns what standard of ADA compliance is applicable, i.e., whether Defendants are held to the standards of new construction, alterations to existing buildings, or are obligated only to remove barriers to disabled access where said removal is "readily achievable."

This issue was considered by the Court, and ruled upon, at Trial on June 1, 2005. Both parties agreed the controlling law was contained in 28 C.F.R. § 36.401.[5] This regulation created a two-pronged test for determining whether a building is subject to the new construction rules. *See* 28 C.F.R. § 36.401(a)(2)(I-ii). Both prongs must be met before a property is considered to be new construction under the

regulations. The first prong cannot be met unless the "last application for a building permit . . . is certified to be complete . . . after January 26, 1992 (or, in those jurisdictions where government does not certify completion of applications, if the last application for a building permit . . . is received . . . after January 26, 1992.)" 28 C.F.R. § 36.401(a)(2)(I). The second prong is met if "the first certificate of occupancy for the facility is issued after January 26, 1993" 28 C.F.R. § 36.401(a)(2)(ii).

Regarding the first prong, the Court found that Monroe County does not certify completion of applications. (Tr., p. 278.) Thus, under the regulation, the applicable date is the date the "last application for a building permit . . . is received." *See* 28 C.F.R. § 36.401(a)(2)(I). The Court found that this date was July 3, 1991. (Tr., p. 286.) Based upon the Court's finding that Monroe County received Defendant's application for a building permit on July 3, 1991, the building did not meet the first prong of the C.F.R.'s requirement, that the application for the building permit be certified after January 26, 1992, and thus comes under the ADA standard for "old buildings."

Since both requirements of 28 C.F.R. § 36.401(a) must be met for the building to

---

sion of the undersigned as Judge Roettger's replacement.

**5.** PART 36—NONDISCRIMINATION ON THE BASIS OF DISABILITY BY PUBLIC ACCOMMODATIONS AND IN COMMERCIAL FACILITIES
SUBPART D—NEW CONSTRUCTION AND ALTERATIONS
(a) General.
(1) Except as provided in paragraphs (b) and (c) of this section, discrimination for purposes of this part includes a failure to design and construct facilities for first occupancy after January 26, 1993, that are readily accessible to and usable by individuals with disabilities.

(2) For purposes of this section, a facility is designed and constructed for first occupancy after January 26, 1993, only—
(I) If the last application for a building permit or permit extension for the facility is certified to be complete, by a State, County, or local government after January 26, 1992 (or, in those jurisdictions where the government does not certify completion of applications, if the last application for a building permit or permit extension for the facility is received by the State, County, or local government after January 26, 1992); and
(ii) If the first certificate of occupancy for the facility is issued after January 26, 1993.
28 C.F.R. § 36.401(a).

be judged under the "new construction" standard, the fact that the County's Certificate of Occupancy was not issued until July 2, 1993 (Tr., p. 252; Exh. 10 Case No. 00–10055–CIV–ROETTGER) would not alter the conclusion of law decided by the Court that the standard to be applied in this case is the lower (readily achievable) standard required of "old" pre A.D.A. existing buildings (Tr., p. 288.)

The term "readily achievable" means easily accomplishable and able to be carried out without much difficulty or expense. 42 U.S.C. § 12181(9), *accord,* 28 CFR § 36.104. In determining whether an action is readily achievable, factors to be considered include:

(A) the nature and cost of the action needed under this chapter;

(B) the overall financial resources of the facility or facilities involved in the action; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such action upon the operation of the facility;

(C) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(D) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity.

---

6. *See, Advocates for the Disabled, Inc., et al v. Resort Key Largo, Inc., et al,* Case No. 00–10055–CIV–ROETTGER, 2000 WL 34460793, and *Brother v. Twin Harbors, Inc., et al,* Case No. 03–10002–CIV–MOORE, hereinafter referred to as "Roettger" or "Moore" case.

42 U.S.C. § 12181(9), *accord,* 28 CFR § 36.104.

Here, Defendants and/or the subject property have previously settled *two* prior ADA cases, involving substantially the same barriers, at the same Hotel property, wherein they were ordered to undertake removal of barriers.[6] Defendants have thus asserted their willingness and ability to make in the required modifications, alterations and/or barrier removal. The trial testimony established that a few modifications were precluded by the "readily achievable" requirement. These items are dealt with on an item basis in this opinion.

**B. Whether Plaintiffs Have Article III Standing to Sue?**

The undersigned has previously analyzed the substantial divergence of opinion among the judges of the Southern District of Florida or organizational standing, in *Disability Advocates and Counseling Group, et al. v. Betancourt, et al.,* 379 F.Supp.2d 1343 (S.D.Fla.2005) and concluded that the various associations for the disabled, such as the Plaintiff herein, do in fact have standing to bring ADA cases in the name of the association. The Court believes that the *Betancourt* opinion stands as solid authority for answering this issue in the affirmative. However, since it is a matter of such critical importance to the Southern District of Florida with such a substantial divergence of opinion, I have quoted those portions of the *Betancourt* opinion, which was authored by the undersigned judge, in the following pages of this opinion numbered 17–32.[7]

---

7. Although consideration of the hundreds of ADA cases that have been filed in this District indicate that almost none of these cases are ever appealed, the Court still hopes that this standing issue may reach the Court of Appeals for a final and ultimate determination. (The

### CONFLICT OF OPINION IN SOUTHERN DISTRICT

#### A. FINAL JUDGMENTS HOLDING PLAINTIFFS HAVE STANDING

In those cases that proceed to final judgment by settlement between the parties, there is a court finding that organizational Plaintiffs like Disability Advocates and Access Now and Steven Brother have established their standing under Article III. In this District, of the Plaintiffs' cases reviewed, over seventy five (75) cases have been resolved in this fashion; resulting in Judgment (including substantial awards of attorneys' fees and costs) for Plaintiff associations.

#### B. PRE TRIAL ORDERS HOLDING PLAINTIFFS HAVE STANDING

The undersigned has denied motions to dismiss based on associational lack of standing in *Disability Advocates v. Gould,* No. 04–22543–CIV (S.D.Fla. Feb. 8, 2005) (minutes of evidentiary hearing on standing), *Association for Disabled v. Key Largo Bay Beach,* No. 04–10081–CIV, 2004 WL 2663257 (S.D. Fla. filed Sept. 10, 2004) and in approximately 18 other ADA cases (see FN 12). All of these rulings, holding that the associations had standing to sue are unpublished, but demonstrate the split of Southern District authority.

Judge Lenard has recently held these same Plaintiffs " ... have established standing to sue in the Amended Complaint, field May 9, 2005", on behalf of the organization. *Disability Advocates v. KDV, Inc.,* No. 05–20414–CIV (S.D. Fla. June 9, 2005) (D.E. No. 20).

#### C. *SUA SPONTE* DISMISSALS HOLDING PLAINTIFFS DO NOT HAVE STANDING TO SUE

Judges can, and frequently do, differ in their interpretation of the law. The Roettger case, referred to above was not ap-

published opinions in *Wein* and *Concerned Parents* rely upon the U.S. Supreme Court decisions in *Hunt* and *United Food* (*infra,* p. 1334–35) in their careful analysis of organizational Article III standing by associations representing the disabled. Each of these district court opinions interpret whether or not Plaintiff association has satisfied the three prongs of the *Hunt* test and therefore has associational standing to bring their claims on behalf of their members. The opinions have differed in interpretation of the third prong of that test; namely, whether or not the relief requested (by the organization) requires the participation of the individual members in the lawsuit.

The other pre trial opinions by different divisions of court and different judges in the Southern District have, in general, based the decision of standing to sue on the *Hunt, United Food,* and *Concerned Parents* decisions.

#### 1. Final Judgments After Trial

The four published opinions by judges of this Court ruling on Article III standing as part of the final decision were issued after final non jury trials with full consideration of the testimony of all witnesses for all parties in non-jury trials. The Plaintiffs, although different in name, were similar ADA organizations. Three of them, Judge Ryskamp, Judge Highsmith and Judge Martinez, decided, after full trials, that the Plaintiff organizations did not have standing to sue. *See Concerned Parents to Save Dreher Park Center v. City of West Palm Beach,* 884 F.Supp. 487 (S.D.Fla.1994); *Ass'n for Disabled Ams., Inc. v. Concorde Gaming Corp.,* 158 F.Supp.2d pealed.)

1353 (S.D.Fla.2001); *Steven Brother and Robert Short v. CPL Investments, Inc.,* 317 F.Supp.2d 1358 (S.D.Fla.2004).[8]

Judge Moore, in *Wein and Access Now, Inc. v. American Huts, Inc.,* 313 F.Supp.2d 1356 (S.D.Fla.2004), rejected Defendant restaurant's motion to dismiss the Plaintiff association for lack of standing to "bring claim on behalf of its members" holding that Plaintiff did have prudential standing to seek declaratory judgment and injunctive relief, under the ADA, for removal of discriminatory barriers. To the extent that Plaintiff sought organizational standing to sue for *damages,* (ie compensatory, mental suffering, anguish, loss of dignity, or punitive damages) on behalf of any of its members the motion to dismiss was granted with leave to amend.

The clear holding of *Wein* is that Plaintiff organizations for the disabled (Access Now—Disability Advocates) meet the three prong test of *Hunt* and have standing to sue when no damages are sought, only declaratory and injunctive relief. These opinions are further analyzed in this opinion *infra,* pp. 1334–38.

Of the four published opinions rendered after trial, referred to above all, except one, awarded declaratory decree, injunctive relief and attorney's fees and costs to the plaintiff organization involved in those cases. This poses a legal issue as to whether or not a ruling awarding relief to a party can be granted if the Court concludes that the party does not have standing to sue. A ruling of no jurisdiction under Article III obviates the necessity for proceeding further or a trial.

Generally, in these ADA cases, defense counsel do not raise by separate written motion to dismiss the issue of standing. Since it rarely is brought to the Court's attention prior to final argument at trial, a division of opinion and resulting split of authority has developed.

## D. FINAL JUDGMENTS GRANTING INJUNCTIVE RELIEF, IMPLICITLY HOLDING PLAINTIFFS HAVE STANDING

The remaining Southern District Judges who have not dismissed Plaintiffs' cases for lack of standing have implicitly found Article III standing in over 75 cases by entry of final judgments for Plaintiffs. Every Final Judgment granting Plaintiffs' injunctive relief, attorney's fees and costs is a legal ruling that the Plaintiffs are proper Plaintiffs with lawful standing to sue and receive judgment. This fact alone, creates substantial split authority in this District over Plaintiffs' standing to sue. From Plaintiffs' perspective, it is better to get a judge on the side of the split of authority that has already decided for you, on standing, than one who has decided against.

Among the group of judges dismissing for lack of standing, a conflict arises between their orders of dismissal of Plaintiffs' cases and other final judgments the same judges have entered in other (different) Plaintiffs' cases wherein it was held that Plaintiffs had standing to sue, obtain injunctive relief, and be paid attorney's fees and costs.

The *Wein* decision recognizes that the third prong of the test has been determined by the United States Supreme

---

8. These ADA adverse dismissal rulings at the District Court level are never appealed. The Eleventh Circuit Court of Appeals has never been presented, or ruled upon the standing issue.

Court in *Hunt* to be prudential and not a constitutional requirement. In the analysis of this opinion where only declaratory, injunctive (or some other form of prospective relief) is sought, as claims on behalf of an organization for monetary damages, Plaintiff and organizations like it have Article III standing to sue.

### 1. Wein v. American Huts, Inc.

The division of opinion by Judges of the Southern District and the reasons supporting Plaintiffs' assertion of standing to sue under Article III are clearly stated in *Wein and Access Now, Inc.*[9] *v. American Huts, Inc.*, 313 F.Supp.2d 1356 (S.D.Fla.2004). In affirming the right of *Access Now* to bring claims on behalf of its members in an ADA case seeking declaratory and injunctive relief Judge Moore said:

> If a party lacks standing to bring a matter before the court, the court lacks jurisdiction to decide the merits of the underlying case. To answer the question of standing, this Court must determine "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limits on its exercise." *See Warth*, 422 U.S. at 498, 95 S.Ct. 2197, 45 L.Ed.2d 343. The threshold question for these constitutional limitations is "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Id.* at 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343. A plaintiff invoking federal jurisdiction must allege "a per-

sonal stake in the outcome of the controversy." *Id.* (citing *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). Pursuant to Article III of the U.S. Constitution, this Court's judicial power exists "only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally." Id. at 499, 95 S.Ct. 2197, 45 L.Ed.2d 343.

\*    \*    \*    \*    \*    \*

An association has standing to sue on behalf of its members when: (1) at least one of its members has standing to sue in his own right; (2) the interests at stake are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit. *See United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 552–53, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996) (citing *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

\*    \*    \*    \*    \*    \*

The Supreme Court has held that the third prong of the test set forth in *Hunt* is a prudential, not a constitutional, requirement. *United Food*, 517 U.S. at 557, 116 S.Ct. 1529, 134 L.Ed.2d 758. This prong "is not normally necessary when an association seeks prospective or injunctive relief for its members..." *Hunt* indicates, however, "that such participation [of an association's members] would be required in an action for damages to an association's members, thus sug-

---

9. Access Now, Inc. has a member composition, purpose, and organization similar to Disability Advocates for standing to sue to remove barriers under ADA. The two organizations are carbon copies of each other.

gesting that an association's action for damages running solely to its members would be barred for want of the association's standing to sue." *See id.* at 545, 116 S.Ct. 1529, 134 L.Ed.2d 758 (citing *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434, 53 L.Ed.2d 383). The determination of "whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *See Warth,* 422 U.S. at 515, 95 S.Ct. 2197, 45 L.Ed.2d 343.

The *Wein* opinion makes clear an ADA organizations' legal standing to sue when it does not seek damages for individual members (only injunctive relief).

Plaintiff *Access Now* cites two orders and one report and recommendation from this District to support its argument that it has standing to bring claims on behalf of its members. See Response at 7–8 (citing *Access Now, Inc. v. Yashar,* 00–CV–2224 (DE # 23) (ordered Mar. 27, 2001); *Access for the Disabled, Inc. v. Splitting Ates, Inc.,* 01–CV–7209 (DE # 17) (ordered Nov. 28, 2001); *Access Now, Inc. v. O'Neil Theaters, Inc.,* 99–CV–7160 (DE # 32) (issued Apr. 26, 2000)). In all three of these actions, the court determined that the "association" plaintiffs had satisfied the three prongs of the *Hunt* test and therefore had associational standing to bring their claims on behalf of their members. This Court notes, however, that the plaintiffs in each of these actions were seeking only declaratory and/or injunctive relief, not damages. *Id.* at 1361.

### 2. *Concerned Parents v. City of West Palm Beach*

The other published opinion analyzing organizational standing to sue under the Americans with Disabilities Act is the final judgment, entered after a full trial on the merits in *Concerned Parents to Save Dreher Park Center v. City of West Palm Beach,* 884 F.Supp. 487 (S.D.Fla. 1994). That case, like the case at bar, sought only injunctive relief on behalf of twelve (12) individual plaintiffs who " . . . were participants in the City's Special Population Program for persons with disabilities at Dreher Park. Each Plaintiff has a specific disability that makes him or her unable or unsuited to participate in the recreational programing offered by the City to the general public." *See Id.* at 489.

In granting the City's motion (after trial) to dismiss Plaintiff Concerned Parents,[10] the Court relied upon *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) and said:

> The Complaint alleged that Concerned Parents is an "association of over fifty parents and volunteers organized to protect the rights of people with disabilities to recreational opportunities in the City of West Palm Beach." They were organized on July 28, 1993, "because of the community's concern that services for disabled persons would be eliminated" by the City in the process of cutting the City's budget.
>
> Concerned Parents cannot establish associational or representational

---

10. Plaintiff did not appeal.

standing to sue on behalf of its members under the three-prong analysis set forth in *Hunt v. Washington State Apple Advertising Comm.*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). *See Concerned Parents to Save Dreher Park*, 884 F.Supp. at 488

Several Southern District Judges have cited the *Concerned Parents* opinion as authority for holding Disability Advocates (and other similar organizations) do not have the essential Constitutional standing to bring these types of ADA complaints.[11] These rulings are in conflict with the *Wein* opinion, *supra*, holding that where declaratory and injunctive relief only is sought (not damages) that the three prongs of the *Hunt* case are met and the ADA organizations here involved have standing to sue.

This Court is of the opinion that there are several important distinguishing factors between the two opinions, that render the Judge Moore's decision in *Wein* the correct legal authority where an organization, like the one involved in the case at bar, is seeking only declaratory and injunctive relief.

The *Concerned Parents* opinion was rendered after a full trial on the merits, where the organization had an opportunity to present the testimony of its individual members. In the case at bar and those cases that have been dismissed upon the form order citing *Concerned Parents*, dismissal has been *sua sponte* shortly after the complaint is filed and prior to any motion to dismiss testing the sufficiency of the complaint and the allegations, which must be taken as true, of the standing of the Plaintiff organizations.

Plaintiffs do not seek damages in this case. They seek only declaratory and injunctive relief and therefore would appear to meet the requirements of *Hunt* for associational standing to sue in ADA cases. More importantly, all of the ADA cases filed by Plaintiffs in the Southern District of Florida in the past several years have sought only declaratory and injunctive relief, *not damages*. The Court is unaware from its review of a substantial number of case filings in the Southern District of *any* case in which anything other than declaratory and injunctive relief was sought.[12]

### 3. Hunt v. Washington State

The leading Supreme Court case articulating a test for Associational Standing, *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), is cited in *Concerned Parents*. *Hunt* holds that an association has standing to bring suit on behalf of its members when:

---

**11.** See "Form Order of Dismissal" being entered in Southern District citing *Concerned Parents* and *Concorde Gaming Corporation*, *supra*, p. 4.

**12.** None of the cases *sua sponte* dismissed (filed by Disability Advocates or the Association for Disabled Americans) have sought damages (only injunctive relief). The prayers for relief in all these complaints are the same:
     **WHEREFORE**, Plaintiffs respectfully request that the Court find that the Defendants have been and continue to be in violation of the ADA and discriminating against Plaintiffs, issue a permanent injunction enjoining Defendants from continuing their discriminatory practices, ordering Defendants to alter the subject premises as appropriate to comply with the ADA, closing the subject premises until the requisite modifications are completed, awarding Plaintiffs their attorneys' fees, costs and litigation expenses incurred in this action, and retaining jurisdiction over this action to assure Defendants' subsequent compliance with the ADA and protect against similar subsequent discrimination by Defendants.

(a) its members would otherwise have standing to sue in their own right;

(b) the interests it seeks to protect are germane to the organization's purpose; and

(c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit

*Id.* at 343, 97 S.Ct. 2434. *Hunt* also held that "individual participation" is not normally necessary when an association seeks prospective or injunctive relief for its members, but indicated that such participation would be required in an action for damages to an association's members. *Id.* at 342–43, 97 S.Ct. 2434.

#### 4. *United Food v. Brown*

In *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.,* 517 U.S. 544, 556, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996), the Supreme Court held that while the first two prongs of *Hunt* are grounded in Article III of the Constitution as an element of the case or controversy requirement, the third prong is prudential in nature. The Court noted that "prudential limitations are rules of 'judicial self-governance' that 'Congress may remove ... by statute.'" *Id.* at 558, 116 S.Ct. 1529.

In *Wein,* 313 F.Supp.2d at 1360, Judge Moore relied on *Hunt* and *United Food and Commercial Workers* in finding that Access Now, Inc. had standing. "Access Now has sufficiently alleged facts to establish that it has standing to pursue declaratory and injunctive relief on behalf of its members." *Id.* at 1360–61. He held Plaintiff did not have organization standing only in those cases where *damages were sought.*

#### E. RELIANCE ON CONCERNED PARENTS AND CONCORDE

#### 1. Concerned Parents

*Concerned Parents,* 884 F.Supp. 487, the seminal case on denial of standing has been the case all other Southern District Judges have relied upon as authority for involuntary *sua sponte* dismissal of ADA case filings. (See form order *supra,* p. 4) As stated above, the case held that Concerned Parents could not establish associational standing to sue on behalf of its members under the three-prong *Hunt* test because any finding of an ADA violation requires proof as to each individual claimant. *Id.* at 488. Additionally, it held that "the relief afforded to each claimant would require an individualized assessment of which measures the City must take in order to comply with the ADA on a case-by-case basis." *Id.* at 489. The opinion states:

The plaintiff cannot, however, shoehorn an unknown number of supposed, but unknown, victims into their cause of action by the mechanism of associational standing. *See, e.g. Terre Du Lac Ass'n, Inc. v. Terre Du Lac, Inc.,* 772 F.2d 467 (8th Cir.1985) ("[a]ssociational standing is properly denied where, as here, the need for 'individualized proof,' [citation to *Hunt* omitted], so pervades the claim that the furtherance of the members' interests requires individual representation"). The City's motion to dismissed Concerned Parents and to strike Concerned Parents as a plaintiff is therefore granted. *Concerned Parents,* 884 F.Supp. at 489

#### 2. Terre Du Lac

*Terre Du Lac* did not involve the Americans with Disabilities Act. The standing issue involved a property owners' association's suit against the developers of a subdivision, pursuant to the

Land Sales Act for failing to fulfill promises to pave roads, complete the sewage system, and offer free access to country club amenities. *Terre Du Lac,* 772 F.2d at 469. The Eighth Circuit held the property owners' association failed the third prong of the *Hunt* standing test because of the type of relief available under the Land Sales Act. *Id.* at 471. The Land Sales Act, which provides for damages and specific performance remedies, differs from the Americans with Disabilities Act, which provides for injunctive relief. The *Terre Du Lac* Court cited an antitrust case for the proposition that in cases of " '*injunctive* relief, associational standing is not denied unless the association is an inappropriate representative for some reason.' " *Id.* (emphasis in original).

### 3. Concorde

In *Association for Disabled Americans, Inc. v. Concorde Gaming Corp.,* 158 F.Supp.2d 1353 (S.D.Fla.2001), the Judge, without discussion, relied on the *Concerned Parents* holding that "any finding of an ADA violation requires proof as to each individual claimant."

### 4. Betancourt

The first assigned Judge, in dismissing *Disability Advocates v. Betancourt,* (the above-styled action) on June 7, 2005 relied on the *Concerned Parents* opinion and the *Concorde Gaming* concurrence.[13] The Court also cited to *Hunt,*

13. *Disability Advocates v. Betancourt,* No. 05–60740–CIV (S.D. Fla. June 7, 2005) (Amended Final Order of Dismissal).

14. Although this has given rise to a conflict of authority in the Southern District, the analysis and holding of the undersigned respecting the important issue of organizational standing to sue should never be misconstrued as any reflection upon the opinions of my fellow judges who may disagree with this analysis. I have the utmost respect for the men and

*United Food and Commercial Workers,* and *Wein. Id.*

Additionally, the first assigned Judge ruled that Plaintiff Stephen Brother lacked individual standing to sue based on his status as a "tester." *Id.* Without Mr. Brother as a plaintiff, Disability Advocates fails the first prong of *Hunt,* namely that they no longer allege "at least one of [their] members has standing to sue in [his or her] own right." If Disability Advocates fails the first prong of the *Hunt* test, Plaintiffs lack Constitutional standing. If, however, the dismissal is based on the fact that Disability Advocates fails the third prong of *Hunt,* it is not a Constitutional standing issue but rather a prudential one. *See United Food.* 517 U.S. at 556, 116 S.Ct. 1529.

This analysis is presented for the sole purpose of demonstrating decisional differences among the Judges of this Court giving rise to a reason for lawyers for ADA organizations to seek assignment to a different judge.

It is not criticism of any colleagues or his or her legal opinion.[14]

### STIPULATED ISSUES OF FACT LITIGATED AT TRIAL

**A. The reasonableness of Plaintiffs' requested modifications in light of the Defendant's remedial efforts to date.**

This issue considered jointly with Stipulated Issue of Fact D *infra.*

women who serve as judges on the Southern District of Florida and only found it necessary to undertake the research and discuss the Southern District conflict of authority in order to rectify what I perceive to be a substantial abuse of the fair and random assignment of cases by certain Plaintiff and Defendant parties, and their counsel, practicing in the specialized field of Americans with Disabilities Act law.

**B. Whether any Plaintiffs suffered an injury in fact sufficient to confer standing on him or her to complain a particular alleged ADA violations?**

This issue has been answered in the affirmative based upon the Betancourt opinion. *Supra*, p. 1329–30.

**C. Whether Defendants, have engaged in efforts to impede, delay or otherwise frustrate the removal of barriers to access at the subject premises? (Defendants do not stipulate to this as an issue).**

The record in this case is quite clear that although the barrier removal mandated by the Judge Roettger opinion was not timely completed, the present owners of the Key Largo Bay Beach Hotel were not responsible for any of the delay involved with the prior owners or the murders, probate litigation and receivership's incurring during the timeframe of the mandated removal of barriers.

The record is further clear that the present owners and operators of the Defendant Hotel were sued two months and twenty days prior to the expiration of the mandated time in Judge Moore's final order for completion of the repairs but, have been fulfilling the obligations of their agreed settlement in the Moore case by the investment of over $150,000 in corrective measures involving approximately 2,000 separate items.

The Court finds that these Defendants have not colluded with anyone to impede, delay or otherwise frustrate the removal of the barriers and that the reasons advanced by Mr. Walsh for the delays in obtaining necessary permits dealing with hurricanes and the problems incident to obtaining the necessary labor to make the completions are valid justifications for bringing the hotel into full compliance.

**D. Whether barriers presently existed in the subject premises?**

■ This issue, and stipulated issue (A) regarding the reasonableness of Plaintiffs' requested modifications will be considered and adjudicated jointly as follows:

The following analysis of the testimony of the witnesses, the exhibits admitted into evidence during the non-jury trial of this case and the current status of the Defendant Hotel property with respect to any existing barriers necessarily commences with the 42–page detailed stipulation of settlement (later incorporated into a final injunctive decree) in the Judge Moore case. On October 14, 2003 (Pl.Exh. No. 11), it would be appropriate to examine the 24 ADA violations (with dozens of subparts) alleged in the Judge Roettger complaint and settlement but given the magnitude and detail of the settlement in the Judge Moore case, the Court finds this to be a good starting point for this analysis.

The 42–page detailed settlement agreement in Judge Moore's case (Case No. 2) dealt with approximately 250 general repairs to the Defendant Hotel resort plus repairs to 70 specific hotel rooms with multiple and detailed modification for a total of approximately 800 specific items that had to be modified, adjusted, repaired or renovated to bring the Defendant Hotel into full ADA compliance. Many of these specific items were the subject of the first Judge Roettger case and the Defendant property owners were specifically mandated to comply with their agreement to make these repairs. Aside from the two specific final judgments in the Roettger and Moore cases, the Defendants were obligated under the Americans with Disabilities Act to make modifications that they deemed appropriate and necessary in order to comply with ADA. At the time the Plaintiffs precipitously filed this third case on September

10, 2004, Defendants had commenced making some of the renovations and repairs. The Defendants still had two months and twenty days within which to complete all of the mandated repairs under Judge Moore's order and their stipulation for settlement in the Moore case, when this third case was filed.

Plaintiffs original complaint in this case set forth 35 alleged ADA violations, many of which it was ultimately determined at the trial to have already been made or were in the process of being completed when this (King) case was filed. By the time the case had progressed to the point that the Plaintiffs had employed an expert who had made an inspection of the Defendant's property and filed his report (Pl. Exh. No. 2), there were 99 specific alleged ADA violations Plaintiff contended needed to be rectified.

By the time the case proceeded to the point that the Plaintiffs filed their trial brief at the commencement of the trial in this case on May 31, 2005, the number of specific ADA violations Plaintiffs contended still existed at the Defendant property had been reduced to 41.

The number of specific alleged violations had increased to over 60 by the time counsel made her opening statement.

Although the number of specific alleged violations fluctuated during the testimony of Plaintiffs' witnesses (due in part to the abandonment of some claims and the withdrawal of others), the total of specific instances of barriers still claimed to be in existence at the subject property devolved further.

### ANALYSIS OF SPECIFIC CLAIMS

During closing argument on Day 7 of the Trial (September 13, 2005), Plaintiff appeared to abandon the following claims:

**Claim No. 7**—Handrails (Not required by ADA regulations).

**Claim No. 30**—Pool Lift (Not required by ADA regulations).

**Claim No. 80**—Balcony Tables

**Claim No. 81**—5–Minute Wait for Ramp

**Claim No. 89**—Microwave Oven Too High (Portable opens supplied by Hotel).

**Claim No. 99**—Defendant Hotel's Website

The Court makes Findings of Fact on each of the claims of alleged barriers as follows:

### Claim No. 2—Sales and Executive Center Restrooms.

The testimony was uncontradicted that this is an employees-only area and falls under the "work area" exception to ADAAG 4.1.1(3). The Court finds Defendant not to be in violation.

### Claim No. 3—Walkway from Lobby to Sales and Executive Center.

This is a work area to a facility that is not offered to the guests of the hotel and hotel guests are not expected to traverse this walkway. Additionally, Plaintiff seeks handrails alleging the slope of the walkway exceeds five percent. The Plaintiffs presented no evidence of their claim. Plaintiff relies a picture of the walkway as proof of the five percent slope without further testimony. The Court finds that Plaintiffs have failed to prove Defendants are in violation of this claim.

### Claim No. 4—Walkway from Exercise Center to Sales and Executive Center.

Plaintiff alleges that there is a grating n the path of travel whose apertures exceed 1/2 inch. This is the same area in which the testimony established the walkway to be approximately fifteen feet wide. The Plaintiffs have not carried their burden to show that the grating is situate within a

36″ path of travel. Moreover, as Plaintiffs' testifying expert admitted, his remedy of painting hash marks around the grate is not required. (Brennan Tr., 2:211). Plaintiffs have failed to prove an ADA violation on this claim.

### Claim No. 8—Entrance Ramp to Lobby.

There is a structural canopy over the *ramp* access to the lobby that covers approximately 40% of the ramp. (Gross Tr., 3:371). The *steps* leading to the lobby are located such that they are completely covered by the canopy. *Id.*

Plaintiffs allege that this constitutes a discrimination against disabled persons by depriving them of equivalent access to the facilities or services available at the hotel. They say it runs afoul of 28 CFR § 36.302, which says that "a public accommodation shall not afford an individual or class of individuals, on the basis of disability … with the opportunity to participate in or benefit from a good, service, facility, privilege, or accommodation that is not equal to that afforded to other individuals."

The hotel in this case consists of nine buildings designed around a "village" concept, meaning that the paths of travel through its facilities and amenities are located outdoors in the elements. (Gross Tr., 3:371). This is true as to the rooms, the pool, the bars and restaurants, the dive shop, and the marina. *Id.* There is no indication on this record that providing shelter over paths of travel from one place to another at the hotel is a "good, service, facility, privilege or accommodation" as such, and Plaintiffs point to no legal authority of any kind in support of such a notion.

The hotel staff, in the event a disabled patron needs to use the lobby ramp in inclement weather, is prepared to assist with umbrellas to provide shelter. (Gross Tr., 3:371). The Court finds that Plaintiffs have failed to prove an ADA violation of this claim.

### Claim Nos. 11, 12—Lobby restroom doors not self closing.

The ADA contains no requirement that restroom doors be self closing. Plaintiffs rely on Florida law that requires self closers for toilet stall doors. Florida Accessibility Code for Building Construction 11.4.17.5. This code, however, only applies to doors installed or altered after 1997. (Gross Tr., 3:377).

The hotel in this case was built in 1992–93, well before the 1997 effective date of the code. (Gross Tr., 3:377). Plaintiffs failed to present any evidence that the stall doors located in the bathrooms have been remodeled or modified after 1997 so as to give rise to liability under the Florida statute. The Court finds that Defendant is not in ADA violation on this claim.

### Claim No. 15—Drain cover in men's restroom.

Plaintiff's expert Michael Brennan testified that a drain cover in the men's bathroom was recessed into the floor greater than 1/4 inch as of April 19, 2005. (Brennan Tr., 5:120). Mr. Michael Walsh testified that the drain cover was fixed after that date and before the trial in this case by mounting it flush with the floor. (Walsh Tr., 4:576). Plaintiff offered no evidence to contradict this testimony, arguing only that the Court should not believe the uncontradicted testimony. The Court finds Mr. Walsh to be a truthful, creditable witness. There is no violation of ADA on this claim.

### Claim Nos. 20–21—Strobes in lobby restrooms.

The parties agree that the strobe lights in the lobby restrooms are mounted on the ceiling, and disagree only as to whether they must be relocated to a position at the lower of 80 inches from the floor or six

inches below the ceiling. As a factual matter, Plaintiffs have not placed any evidence in the record to show that the strobes were installed as part of a modification to the property occurring after it was constructed. Accordingly, there is no occasion to enter an injunction based upon any alleged deviation from ADAAG. The Court also finds the testimony of Defendants' expert, that lowering the strobes is not readily achievable due to the fully marbled walls, to be creditable and accurate. (Gross Tr., 3:379–80). There is no ADA violation on this claim.

### Claim No. 22—Lowered counter in the gift shop.

There is a conflict in the record as to whether the lowered counter in the gift shop reaches a minimum of 36 inches in width. Plaintiffs' expert Brennan states that it measures 22 inches in width. (Brennan Tr., 5:121). Michael Walsh testified that it is 36 inches in width (Walsh Tr., 4:576–77).

Mr. Brennan's first written report of his February 24, 2005 inspection indicated that the counter measured 22 inches. (Exh. No. 2, p. 5). A subsequent report entered into evidence in this case indicated that Mr. Brennan measured the counter on April 19, 2005 as being 30 inches. (Exh. No. 4, p. 13).

At trial, however, and notwithstanding his later report, Mr. Brennan's trial testimony was that on April 19, 2005, the counter was "unchanged" from the February 24 inspection, when it had measured only 22 inches. (Brennan Tr., 5:121). The Court finds Plaintiffs' witness Brennan unbelievable on this issue. The counter in question is 36 inches as ADA required, and this claim is denied.

### Claim No. 23—Lack of strobe in gift shop.

Plaintiffs allege that the gift shop lacks a strobe. The Defendants' expert testified that the strobe in the lobby is visible from the gift shop. (Gross Tr., 3:380).

Plaintiffs presented no evidence on distance of the strobe from the gift shop. Plaintiffs have not carried their burden to show that the strobe in question is more than 50 feet away, as the ADA requires. Plaintiffs having failed to show an ADA violation, and the claim is denied.

### Claim No. 26—Elevator door hardware.

The parties agree that this issue has been addressed by removing the doors providing access to the elevator emergency phones, and that injunctive relief is not warranted. (See Plaintiffs' 13–page demonstrative exhibit listing barriers). The only question remaining relates to attorney's fees, since the parties agree that the doors were not removed until after April 18.

Defendants maintain that they never did constitute a barrier to disabled access and removal was not necessary because the doors were operable by a closed fist as they were required to be. This is based on the testimony of Defense expert Gross, who said the doors were so operable. (Gross Tr., 3:384). It is also based on the testimony of Mr. Walsh, who testified that he witnessed Mr. Brennan himself open the doors with a closed fist. (Walsh Tr., 4:577–78). The Court finds under the circumstances, the presence of the doors did not violate the ADA and does not constitute a basis for any award of fees.

### Claim Nos. 27, 45, 46—Elevator emergency communications.

Plaintiffs allege that the hotel's elevator phones are not hearing aid compatible, citing ADAAG 4.10.14. They also allege that the elevator emergency communications devices do not have a built-in dialer so that voice communication is not required.

The testimony at trial by both parties was that the emergency communications system is not hearing aid compatible, and the parties merely differ over whether this is required. (Gross Tr., 3:385–86; Walsh Tr., 4:577–78; 5:11).

Regarding the hearing aid compatibility issue, ADAAG 4.10.14, which specifically governs elevator emergency communications systems, makes no mention of any such requirement. In support of their position, Plaintiffs cite to ADAAG 4.31.5. This section, however, governs only *public telephones* that are required under ADAAG 4.1 to be installed as part of new construction. The elevator emergency communications system in this case is not a public telephone, nor is the hotel subject to any new construction standards as set forth in ADAAG 4.1. Accordingly, the Court finds no violation on this issue.

Regarding Plaintiffs' next contention, that the elevator emergency communications system requires voice communication, the testimony at trial was that the emergency communications system did operate without the need for voice communication. Mr. Walsh both testified that when Mr. Brennan picked up the handset for the emergency communications system, the front desk answered and knew where he was without his telling them. (Walsh Tr., 5:10–11). The Court can find no violation where the elevator emergency communications system alerts hotel staff to the existence and location of an emergency as soon as a handset is lifted, without the need for voice communication. Plaintiffs' request for injunctive relief as to this item is denied.

**Claim No. 28—Pool Area Tables.**

Plaintiffs abandoned this claim.

**Claim No. 29—Route from pool elevator to pool area.**

Plaintiffs allege that the accessible route from the pool elevator to the pool area has, in places, slopes that exceed 5%, which would trigger a requirement for handrails to be installed under ADAAG 4.8, governing ramps. The allegation is misplaced.

Michael Walsh and defense expert Jeff Gross both testified that the accessible route in question rises 16½ inches over a 33 foot 6 inch distance. Calculating slope as the rise over the run, it yields an overall slope of 4.1%, well under the 5% figure. (Gross Tr., 3:386, 388–89; Walsh Tr., 4:585; 5:11). Furthermore, Mr. Walsh testified that he confirmed this rise with a builder's level, and additionally ran string line with a spacer down the surface of the ramp, which indicated that there were no variances over 1/4 of an inch. (Walsh Tr., 4:586). The Court finds this testimony accurate and credible.

Plaintiffs' expert Mr. Brennan testified that he measured the slope of the 33 foot 6 inch pathway in several places using a six-inch "torpedo" level. As shown by the testimony of Mr. Gross, however, such measurements are inherently inaccurate because they exaggerate hips and dips in the surface. (Gross Tr., 3:388–89). Furthermore, as Mr. Gross and Mr. Walsh both testified, the pavers from which the ramp is constructed shift over time and keeping them consistent is a maintenance item. (Gross Tr., 3:389; Walsh Tr., 4:586). Mr. Walsh's prior experience with surveying and his credibility convince the Court of the accuracy of his testimony on this issue. He is the more believable.

Using Plaintiffs' method of measurement that inherently exaggerate variances in the accessible path, the worst measurements Plaintiffs were able to come up with were 5.3% and 5.4%. (Exh. No. 4, p. 17). Even if Plaintiffs' measurements were valid, which they are not, the ADAAG does not demand the type of absolute perfection Plaintiffs apparently seek. Specifically,

ADAAG 3.2, titled "Dimensional Tolerances," specifically states that all dimensions used in the ADAAG are subject to conventional building industry tolerances for field conditions. Under the circumstances where the unrebutted testimony is that the accessible route overall is less than a 5% slope, and that there are very minor if any hips or dips in it, injunctive relief should be denied. This claim, having not been established by credible testimony is denied. The Court finds that Plaintiffs have not met their burden of proof that the slope exceeds 5%.

**Claim Nos. 31, 34—Lowered counters at vendor huts.**

Under ADAAG 7.2(1), a lowered portion of a sales counter is required only where the sales counter has a cash register. If there is no cash register, ADAAG 7.2(2) permits the use of auxiliary counters, folding shelves, and alternate desks to take the place of lowered counters. Plaintiffs have failed to present any evidence as to whether the sales counters in question have cash registers and are therefore subject to the stricter standard.

Mr. Gross testified there are lowered tables available for use at the subject counters to accommodate any need for lowered counters. (Gross Tr., 3:393–94). Since there is no evidence in the record that the sales counters in question have cash registers on them, there is no basis to hold Defendants to any stricter standard. Plaintiffs have therefore failed to carry their burden to show entitlement to injunctive relief on this issue.

**Claim Nos. 33, 43, 72—Paths of access to Tiki Huts.**

These alleged barriers concerned paths of access to the beach area. They fail to support a claim for injunctive relief, for the following reasons.

First, Plaintiffs cite to a *proposed* regulation, ADAAG 16.4, in support of their claim. (Exh. No. 4—Brennan Report at Addendum 3). Plaintiffs cite to no authority supporting the notion that these Defendants must comply with proposed regulations, and Defendants have located none. The Court finds that Plaintiffs urging of ADA regulations that are not adopted is a total waste of this Court's time.

■ Plaintiffs seek injunctive relief forcing the construction of an accessible path on the beach and into the water, on state or county property not owned by Defendant. (Walsh Tr., 4:589). Because the Defendants do not own the beach, it falls outside the definition of "facility" under Title 3 of the ADA. *Pickern v. Pier 1 Imports, Inc.,* 339 F.Supp.2d 1081 (E.D.Cal.2004). There is no legal basis to find an ADA violation pertaining to property not owned by these Defendants.

As Mr. Gross testified, there are specially designed wheelchairs for mobility-impaired persons wishing to access a beach. (Gross Tr., 3:396). Under 28 CFR 36.306, however, a public accommodation is not required to furnish personal devices, such as wheelchairs, to disabled patrons. For the foregoing reasons, there can be no finding of an ADA violation as to paths of access in the beach area.

As to the paths of access to the Tiki huts, the testimony of Mr. Gross and Mr. Walsh is that an accessible route exists, consisting of a concrete walkway along the bay and hard-packed sand in the tiki hut area. (Gross Tr., 3:417–18; Walsh Tr., 5:23). Mr. Walsh's testimony specifically was that the surface of the ground underneath the tiki hut resembles a hard-packed sand road, and furthermore testified that cars may be driven on it. (Walsh Tr., 5:23).

On Plaintiffs' last complaint regarding the tiki huts, that there was a platform

that was inaccessible, Mr. Walsh testified that it was a temporary bandstand being stored under the hut to be out of the weather. According to Mr. Walsh's unrebutted testimony, that bandstand has been moved to a storage room underneath one of the restaurants. (Walsh Tr., 5:25). Accordingly, it can no longer be an issue as it relates to the ADA.

Plaintiffs' final issue is as to the accessible route to the tennis court. On the first day of trial, Plaintiffs complained that the path failed to meet the minimum 36-inch requirement because it only measured 35½ inches in one, or possible two, locations. (Brennan Tr., 1:152–53). This particular issue has been addressed and modified. The Court finds the walkway now measures 40 inches in width. (Gross Tr., 3:407–08; Walsh Tr., 5:9).

What the Plaintiffs now say is that the accessible route terminates at some "netting," forming an obstacle to access. What Plaintiffs' photographs show, on the other hand, is that the route terminates at a section of netting that slides open in the same way a shower curtain does, to allow access to the tennis courts and yet keep balls within. (Exh. No. 6B, pp. 7, 16–17). Plaintiffs have yet to cite any authority for the proposition that this netting violates the ADA or entitled them to injunctive relief. The Court finds that Plaintiffs have failed to sustain their burden of proof on these three issues.

**Claim No. 35—Shepherd's hook and life ring.**

Plaintiffs allege that the Shepherd's hook and life ring is mounted too high because it is more than 48 inches from the deck. Plaintiffs fail to introduce any testimony, however, as to how high off the deck the equipment is located, but instead stated only that it was "beyond reach parameters." (Brennan Tr., 1:146). They asked that the Court order the equipment to be lowered to 48 inches from the deck. (Exh. No. 4—Brennan Report at 21). The reason Plaintiffs fail to carry their burden as to this item is that there are two separate maximum height requirements in the ADAAG. Section 4.2.5 says that where a disabled person has to reach *forward,* the maximum height is 48 inches. However, Section 4.2.6 says that where a disabled person can approach parallel to an item and reach from the *side,* there is a greater maximum height allowance of 54 inches. Since there is no indication that a disabled person may not make a side approach on the pool deck to the life saving equipment, there is no basis to conclude that the applicable height requirement is 48 inches as opposed to 54 inches. Accordingly, without any evidence in the record as to what the height of the equipment actually is, there is no basis to conclude that it runs afoul of ADA requirements.

Additionally, there is a safety issue involved because life saving equipment must be mounted high enough to be visible in an emergency. (Walsh Tr., 4:590). The implementing regulations for the ADA specifically recognize that a public accommodation may impose "legitimate safety requirements that are necessary for safe operation." Under the circumstances where the visibility of life saving equipment is just such a safety concern, it represents an independent basis for the denial of injunctive relief as to this issue.

The other complaint as to the life saving equipment is that it is inaccessible to due to lounge chairs being moved into the path leading to it, and/or that a light fixture obstructs access. On the first issue, it is clearly futile for the Court to enter an injunction requiring lounge chairs to be moved where they are of the typical portable variety, constantly moved not only by staff, but also by guests. For this reason as well, Plaintiffs fail to sustain their bur-

den to show entitlement to injunctive relief under the ADA. This claim is not a violation and is denied.

**Claim No. 36—Handrail extensions at spa treatments.**

Plaintiffs next allege that the stairway leading to an upstairs spa is in violation because it fails to meet a requirement that it either have (a) continuous handrails or (b) they have handrail extensions at the landings. (Brennan Tr., 1:147). This contention is based on Plaintiffs' insinuation that Defendant is held to the "new construction standards." *Id.*

The Court ruled during trial, that the hotel in this case is not subject to new construction standards. Accordingly, the stairs in question are not required to be a route accessible to disabled persons, and indeed they are not. As Mr. Gross testified, the hotel has a policy of making massages and other treatments available in the spa to disabled guests either downstairs in the pool area or in the guest's room. (Gross Tr., 3:399). A guest would never have to use these stairs to get a massage.

By its own terms, ADAAG 4.9, regarding standards for stairs, applies only to stairs required to be "accessible" by ADAAG 4.1. ADAAG 4.1 in turn requires that interior and exterior stairs in *new* construction comply with ADAAG 4.9. There is no such requirement as it relates to existing facilities unless the stairways in question have been altered. In those cases, ADAAG 4.1.6(3)(b) states that where stairways have been altered, handrail extensions are still not required if they would be hazardous or impossible due to plan configuration.

In this case, Plaintiffs have presented no proof that the stairway in question has ever been altered since the date it was built. Accordingly, there can be no basis for a finding that it is subject to the standards of new construction set forth in ADAAG 4.9. The Court finds Plaintiffs have not established a basis for injunctive relief on this claim.

**Claim No. 39—Foot of ramp north of pool.**

Plaintiffs next allege that there is an ADA violation at the foot of the ramp leading from the pool to Gus' Grille, where the slope is 17 to 26%. Again, Plaintiffs fail to carry their burden to show a violation.

The ADA does not require accessible routes to be perfectly flat everywhere. ADAAG 4.5.2 specifically addresses "changes in level" occurring in an accessible route, and states that changes in level up to 1/4 inch may be perfectly vertical without any edge treatment whatsoever. Changes in level between 1/4 inch and 1/2 inch are also allowed, provided they are beveled with a slope no greater than 1:2, or 50%.

Plaintiffs failed to introduce any evidence that the change in level at the foot of the ramp in question exceeds 1/2 inch. Accordingly, even if the change in level were as much as 1/2 inch, a slope of 50% would be permitted under ADAAG 4.5.2. Without any evidence from the Plaintiffs that the change in level exceeds 1/2 inch, the observation that the slope of that bevel ranges from 17% to 26% is insufficient to support a finding of an ADA violation. Accordingly, Plaintiffs have failed to carry their burden to show that they are entitled to injunctive relief as to this issue and it is denied.

**Claim No. 40—North pool gate.**

Plaintiffs have two complaints regarding the north pool gate, which consists of stairs leading up to the pool deck which are not part of an accessible route. The first complaint is that the stairs lack handrails as required by ADAAG 4.9. As indi-

cated previously, however, ADAAG 4.9 applies only to new construction or altered portions of existing facilities. The Court has already ruled that this hotel is not subject to the new construction standard across the board, and the Plaintiffs have failed to introduce any evidence that the stairs in question have ever been altered since they were first built. Accordingly, there is no basis for injunctive relief as to the handrail issue.

Plaintiffs' other issue with regard to the north pool gate is that it does not have signage indicating the location of the nearest accessible entrance pursuant to ADAAG 4.1.6. Under the clear terms of 4.1.6, however, the standards set forth therein apply to alterations done to accessible buildings. Since there is no evidence of the pool gate in question ever having been altered, there is no occasion to apply the requirements of 4.1.6 to it, including the provisions for signage set forth in 4.1.6(1)(h). As such, injunctive relief will not lie on account of this issue, either, particularly given the testimony by the Defendants that the accessible route is visible from the north pool gate. The claim is denied.

**Claim Nos. 41, 42—Dive shop signage and parking space.**

Plaintiffs again have two complaints with regard to the dive shop. The first is that there is no signage indicating the location of the accessible route to the entrance. As was the case with the signage at the north pool gate, however, signage at the dive shop is not required because the hotel is not subject to the new construction standards generally, nor have the Plaintiffs put on any evidence that the entrance way in question has undergone any alterations since it was built. Accordingly, there is no occasion to subject the entrance to the signage requirements of ADAAG

4.1.6(1)(h), and no occasion for the entry of injunctive relief as to that issue.

Plaintiffs' other issue is that there is not an accessible parking space immediately adjacent to the dive shop, and that the nearest accessible parking space is at most feet away.

As the testimony showed, the Marriott Key Largo has created nine accessible parking spaces, even though it is only required to have seven. Moreover, as Mr. Walsh testified, the area of the parking lot where the Plaintiffs request the Court to order the parking space to be created has slopes in existence that exceed those permitted by the ADA, the alteration of which would create other areas which are too steep to have foot traffic and result in spillage of drainage water into the waterway, which the property is not permitted to do. (Walsh Tr., 4:6–7). As Mr. Walsh testified, there is a 14 foot change in elevation from the U.S. 1 side of the property to the Gulf side, which complicates any alterations to slopes in the parking lot. (Walsh Tr., 4:7).

The code section cited by the Plaintiffs, ADAAG 4.6.2, governing the location of accessible parking spaces, indicates only that such spaces be located on the "shortest *accessible* route of travel" from the parking area to an accessible entrance. Given the testimony of Mr. Walsh, the parking space Plaintiffs asked the Court to order created is not on an accessible route of travel due to the severe cross slopes. In fact, there is no indication in the records that the parking space located at most 80 feet away—approximately the length of the courtroom where this case was tried—is not on the shortest accessible route of travel. In any event, ADAAG 4.6.2 requires only that parking spaces "shall be disbursed and located closest to the accessible entrances" in the case where a property has buildings with multiple ac-

cessible entrances with adjacent parking. Defendants in this case have disbursed accessible parking spaces in the lobby area, the pool area, the area by Gus' Grille and the Gulf of Mexico, and the tennis courts and Breezers, and covered parking for a high top van in the garage. Under the circumstances, there is no basis to find an ADA violation with regard to the lack of a parking space located immediately adjacent to the dive shop, and no occasion to grant injunctive relief on that issue.

**Claim Nos. 49, 59—Plastic trash cans in restrooms.**

Plaintiffs next allege that injunctive relief is warranted because their testifying expert has observed plastic waste cans on two occasions that have been moved into a 30 inch by 48 inch clear floor space required by ADAAG 4.19 in the restroom areas. As Mr. Gross testified, he witnessed the plastic waste cans being moved from the clear floor space during his visit on March 29, 2005. (Gross Tr., 3:413–14). As with the lounge chairs on the pool deck, portable plastic waste cans are not an item susceptible of an enforceable injunction. Accordingly, injunctive relief is denied as to this item.

**Claim Nos. 54, 55—Grab bars in Breezers restrooms.**

Plaintiffs next allege that the grab bars at the rear of the commode in the Breezers restrooms do not meet the requirements of ADAAG 4.1.6 because they measure only 24 inches long where that section requires that they be 36 inches long. Again, however, 4.1.6 applies only to alterations made to existing buildings. Plaintiffs have not showed or tried to show that any alterations (new construction) have been made in the Breezers restrooms. Accordingly, they have failed to carry their burden that ADAAG 4.1.6 has any application to this issue. Injunctive relief is therefore denied.

**Claim Nos. 61–69—Women's restroom at Gus' Grill.**

Plaintiffs' next nine items relate to noncompliance in the women's restroom in the top floor of Gus' Grille. As Plaintiffs' testifying expert admitted, however, it is permissible to convert the men's restroom to a unisex restroom with disabled access. (Brennan Tr. 2:220–21). That in fact was done, and there was signage placed on the unisex bathroom indicating that it was accessible to the disabled. (Walsh Tr., 5:20).

There is no requirement that the women's bathroom also have a sign under the circumstances where there is no showing by the Plaintiffs that it has been altered within the meaning of ADAAG 4.1.6. Moreover, the restrooms are only four feet apart, and a disabled patron has to go *past* the signed unisex bathroom to get to the women's bathroom, obviating any need for a sign on the women's restroom in the first place. (Walsh Tr., 5:20). There is no violation and injunctive relief is denied as to this issue.

**Claim No. 71—Sign for passenger drop off and loading zone at Gus' Grille.**

Plaintiffs allege an ADA violation because there is no sign for a passenger drop off and loading zone at the Gus' Grille porte cochere. As they admitted, however, the barrier listed in Mr. Brennan's report initially referred to a porte cochere at Breezer's, which does not exist.

Plaintiffs claim that the reference to "Breezer's" is merely a typographical error, and that the "violation" at Gus's was still in existence as of May 31, 2005. (Brennan Tr., 4:134). Mr. Brennan's testimony is flatly contradicted, however, by his own report, which states clearly and unequivocally that as of April 19, 2005, *"the proper signage has been installed"* at Gus's Grill. (Exh. No. 4—Brennan Report, p. 8). Mr. Brennan even referred to

a picture showing that the appropriate signage was installed as of that date. (*Id.*, *see* Exh. No. 6A-picture 39). Accordingly, this claim for injunctive relief is denied.

## Claim Nos. 73, 96—No white stripes in parking space.

Plaintiffs allege a lack of white stripes in accessible parking spaces. The Court heard testimony regarding the parking stripes during day 6 of trial. Plaintiff attempted to show, via an April 13, 2005, photograph, that the accessible parking spaces were missing white paint. (Tr., 6:75). Defendant showed a more recent photograph that included white paint. The Court found that the recent hard evidence indicated compliance and excluded the older evidence. (Tr., 6:75–76). These claims are denied.

## Claim No. 87—Handheld shower head Room 109.

Plaintiffs next allege the existence of an ADA violation because there are testifying expert observed that there was no handheld shower head in guest room 109. Mr. Walsh has testified, however, that one did exist, but was being fixed. (Walsh Tr., 5:41). There is no basis or reason to doubt Mr. Walsh's testimony in this regard, nor his testimony that another handheld shower head would have been brought in had a disabled guest requested it. (Walsh Tr., 5:40–41). The Court finds the shower head is installed properly. (Walsh Tr., 5:41). Injunctive relief therefore does not lie for this issue.

## Claim No. 90—Power door in Room 128.

None of Plaintiffs' expert's reports ever mentioned an issue with a power door opener until after this case was first continued by the Court. It was never raised in any pleading or motion. In fact, barrier 90 in the Plaintiff's original report merely says that the toilet in the room did not provide for a side approach. (Brennan Tr., 4:137). Accordingly, whether the power door was actually being installed, as Mr. Brennan claims, or whether it was simply being maintained or fixed, is not an issue in this case because the Plaintiffs never complained about it before nor was it properly raised as an issue. Injunctive relief is denied as to this item.

## Claim Nos. 85, 86—Tub seats not adjacent to controls and not securely mounted.

Defendants' testimony in this case is that the tub seats in question are permanently screwed into the wall and are secured within the meaning of applicable regulations. (Gross Tr., 3:483; Walsh Tr., 5:40). Plaintiffs have failed to prove that the tub seats are outside "reach parameters." The section Plaintiffs cite, ADAAG 4.21, (on this issue) applies to shower stalls, not bathtub showers. Accordingly, injunctive relief does not lie and the claim is denied.

## Claim No. 98—Lack of signage regarding availability of audio system in meeting room.

Plaintiffs finally allege that an ADA violation exists due to the lack of signage in a meeting room regarding the availability of assistive listening devices. The regulation they cite, ADAAG 4.1.3(19)(b), however, applies to new construction. Since this Court has already ruled that the hotel is not subject to the new construction standard generally, Plaintiffs have failed to carry their burden to show that injunctive relief is warranted as to any violation of the ADA relating to this issue. This claim is denied.

## V. ATTORNEY'S FEE ISSUES

■ Plaintiffs' attorney seeks attorney's fees in the amount of $68,893.25 and costs in the amount of $32,019.85 for a total of $100,913.10. 42 U.S.C. § 12205 grants the

Court discretion to award a "reasonable attorney's fee, including litigation expenses, and costs" to the prevailing party. The United States Supreme Court has stated, "to qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim." *Farrar v. Hobby*, 506 U.S. 103, 111, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). More recently, the Court invalidated the theory that, "a party that has failed to secure a judgment on the merits or a court-ordered consent decree, but has nonetheless achieved the desired result because the lawsuit brought about a voluntary change in the defendant's conduct" could still be considered a prevailing party for the purposes of fee shifting statutes. *See Buckhannon v. West Virginia Department of Health and Human Resources*, 532 U.S. 598, 600, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). Accordingly, a party cannot be considered the prevailing party absent some court order that changes the legal relationship between the parties. *Id.* at 604, 121 S.Ct. 1835.

Here, for the reasons discussed *supra* the Plaintiffs cannot be considered prevailing party. The Defendant property was already subject to two valid Court orders requiring ADA compliance. Defendants had expended hundreds of thousands of dollars making Court-required modifications before the commencement of the above-styled lawsuit. Indeed, at the commencement of this lawsuit, Defendants had completed nearly all of the required modifications and still had several months before the expiration of the mandated time to complete said modifications.

■ The Court recognizes that a few of the required modifications were not completed by the November 30, 2004 deadline. Because these modifications have since been completed, it is unnecessary, and in fact futile for the Court to now order the changes made. However, even if the Court did order Defendants to complete the ADA modifications, Plaintiffs would still not be entitled to attorney's fees. *See Dillery v. City of Sandusky*, 398 F.3d 562 (6th Cir.2005) (Affirming district court's denial of attorney's fees in ADA action where Plaintiff only prevailed in proving an ADA violation that a prior Judge in a separate lawsuit had previously ordered repaired.) Because the Defendants were already subject to a legally binding Court order to bring the subject property into ADA compliance, and because Plaintiffs failed to prove any current violations, there is not a change in the legal relationship between the parties. Accordingly, the Court finds Plaintiffs are not the prevailing party and should not receive an award of attorney's fees or costs.

### CONCLUSION

Accordingly, after a careful review of the record, and the Court being otherwise fully advised, it is ORDERED and ADJUDGED that the above-styled action be, and the same is hereby, **DISMISSED WITH PREJUDICE** for Plaintiffs' failure to prove any current ADA violations. It is further ORDERED and ADJUDGED that Plaintiff's Motion for Attorney's Fees and Cost be, and the same is hereby, **DENIED**. The Court retains jurisdiction to consider a motion by Defendants for Fees and Costs.